STATE of Missouri, Respondent,

v.

Tommy ROLLINS, Jr., Appellant.

No. WD 69814.

Missouri Court of Appeals,
Western District.

July 13, 2010.

As Modified Aug. 31, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 2010.

Application for Transfer Denied
Oct. 26, 2010.

S. Kate Webber, Kansas City, MO, for appellant.

Shaun J. Mackelprang and James B. Farnsworth, Jefferson City, MO, for respondent.

Before LISA WHITE HARDWICK, C.J., JAMES M. SMART, JR., and CYNTHIA L. MARTIN, JJ.

JAMES M. SMART, JR., Judge.

Tommy Rollins, Jr., was convicted in Jackson County Circuit Court of first-degree assault of a law enforcement officer, armed criminal action, first-degree assault, and unlawful possession of a weapon. On appeal, he seeks a new trial on the ground that the court improperly overruled his objections to the State's peremptory challenges in the jury selection. He also seeks a new trial on the ground that the court erred in refusing to give the instruction he requested as to abandonment or renunciation of criminal purpose. We affirm the convictions.

## Background

In late May 2005, Rollins was angry that he had been discharged from his job as a custodian at an elementary school. Rollins decided he wanted to take revenge on the principal, Dred Scott, by killing Scott at his home. He looked up Scott's address. He went to the internet and obtained directions to Scott's house. Rollins purchased a semi-automatic handgun, loaded it, and also put together two firebombs consisting of gasoline in bottles with washcloths for wicks.

At approximately 2:00 a.m. on May 28, 2005, Rollins was en route from his residence in Grandview to Scott's house in Independence, driving along I–470 northbound toward the exit for Scott's house, when his vehicle caught the attention of Missouri State Highway Patrolman Brandon Brashear. Trooper Brashear, noted that Rollins was speeding and decided to stop Rollins' vehicle for speeding. As Brashear climbed out of his cruiser to walk toward Rollins' car, Rollins drove away. Brashear got back into his patrol car and pursued Rollins. The chase began near the exit for Woods Chapel Road on I–470 North. Several miles down the highway, near the Lakewood exit, Rollins pulled to the shoulder and stopped. Brashear again parked behind Rollins. Rollins emerged from his vehicle with the semi-automatic handgun. Brashear, who was exiting from his vehicle and in the process of unholstering his gun, yelled at Rollins to drop the weapon, but Rollins immediately commenced firing. Rollins, with his initial actions recorded on video by the police car's dash camera, advanced toward Brashear,

firing his handgun, hitting Brashear, and forcing Brashear to try to seek refuge behind his vehicle. Rollins followed Brashear while firing. He swore at the trooper and yelled, "You're going to die, you're going to die." Brashear fell face first to the ground in the grass off the shoulder. Rollins walked up behind Brashear, as though to finish the execution, fired another shot into Brashear's back and another shot at Brashear's head. The shot into the back struck Brashear between the shoulders but missed the spinal column. The other shot struck the trooper's jaw and lodged in his left cheek. Brashear, still conscious, heard Rollins get back in the car and drive away.

Almost immediately thereafter, an Independence police officer came upon the scene. Brashear was flown by helicopter to a hospital. Emergency personnel concluded Brashear had been hit with at least twelve bullets. Miraculously, Brashear survived. Moreover, though he underwent numerous surgeries and therapeutic procedures, and bears permanent residual effects from the shooting, Brashear was able eventually to return to duty as a state trooper.

Back to Rollins and his actions on the date in question. Following the attack on Brashear, Rollins continued to the area where Mr. Scott lived with his wife and young child. He passed several exits, then exited the highway at Hidden Valley Road and turned right on 31st Terrace. He followed that street to Scott's subdivision, which he had not previously been in. He found very winding, confusing streets. He drove around the neighborhood in the dark, perhaps without being able to identify Scott's house.[1] Sometime after entering the subdivision, he left the gun and the firebombs in the weeds in a lot in the subdivision. He said he threw them out of the window of his car. He then drove to a bar near the highway exit. He entered the bar and told the bartender that he had just shot a police officer and wanted to turn himself in.

The police arrived, entered, and arrested Rollins, who was unresponsive to commands and had to be physically restrained and handcuffed. At the police station, Rollins was advised of his rights and interviewed. He said he was angry with Scott for firing him and that he was on his way to "get" Scott. Rollins was also angry that he had been stopped by Trooper Brashear, and he thought the stop was a result of racism. Rollins said he tried to flee from Brashear. When the trooper chased him, Rollins said, he thought the stop might end in a shooting. He said he feared that Brashear would shoot him, and he said to himself, "I'll give him a reason to shoot me."

Rollins was charged in Jackson County Circuit Court with first-degree assault on a law enforcement officer under section 565.081,[2] armed criminal action under section 571.015, first-degree assault (as an attempt) under section 565.050, and unlawful possession of an illegal weapon under section 571.020.[3] Rollins entered a plea of not guilty, contending that he was not guilty by reason of mental disease or defect excluding responsibility.

1. The State and the defendant dispute whether he got lost or whether he changed his mind about carrying out the plan to "get" Scott. In his statement to police, he said that he changed his mind about the attack. The next day, when he and the police went back to the subdivision to find the weapons, the defendant reportedly had trouble finding his way around the winding streets in the subdivision.

2. Revised Statutes of Missouri (RSMo), cum. supp.2003. Subsequent statutory references are to RSMo 2000 except where otherwise noted.

3. RSMo, cum. supp.2002.

After the trial in 2008, the jury found Rollins guilty on all counts. The jury recommended that Rollins be sentenced to life imprisonment for the first-degree assault of Trooper Brashear, life imprisonment for the associated armed criminal action, fifteen years of imprisonment for the first-degree assault (attempt) as to Scott, and seven years of imprisonment for possession of the firebombs. The court followed the jury's recommendations in imposing sentence.

## Alleged Instructional Error

■ We first take up Rollins' second point on appeal, in which Rollins asks for a new trial on the basis that the trial court erred in refusing an instruction to the jury that would have allowed the jury to find, as a defense to the first-degree assault involving Mr. Scott, that Rollins had, after arriving at Scott's neighborhood, abandoned his criminal purpose to assault Mr. Scott.

■ Claims of instructional error are reviewed *de novo*. *Marion v. Marcus*, 199 S.W.3d 887, 893 (Mo.App.2006). If the instruction is required or authorized by law and is material to the issues to be decided by the jury, and if the evidence supports the giving of the instruction, the trial court must give the instruction. *Id.* at 892–93 (*citing* Rule 70.02(a)).

Here, the defendant was charged with violation of section 565.050.1, which provides:

A person commits the crime of assault in the first degree if he *attempts* to kill or knowingly causes or attempts to cause serious physical injury to another person.

(Emphasis added.) We see from the statute that the crime of first-degree assault is committed by an "attempt" to kill or to cause serious physical injury (as well as, of course, by the completion of the act causing injury or death). Either way, attempted or completed injury, it is first-degree assault.

## Voluntary Abandonment

The instruction Rollins sought was as follows:

As to count 3, if you find and believe from the evidence that the Defendant voluntarily abandoned his plan to assault Dred Scott by throwing the Molotov cocktails and firearm out of the window of his car, then you must find the Defendant not guilty of the first degree assault of Dred Scott as submitted in Instruction No. _____.

The concept of "attempt" in Missouri is governed by section 564.011. *State v. Withrow*, 8 S.W.3d 75, 78 (Mo. banc 1999). This includes the concept of attempt within the first-degree assault statute (section 565.050.1), as well as attempts to commit other offenses. *Id.*; *see State v. Williams*, 126 S.W.3d 377, 381 (Mo. banc 2004). Section 564.011.1 states:

A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

This statutory provision, borrowed from the Model Penal Code, became effective January 1, 1979.[4] *Withrow*, 8 S.W.3d at

---

4. The State did not adopt Model Penal Code (MPC) section 5.01 in its entirety. The text of the entire MPC section appears in *State v. Molasky*, 765 S.W.2d 597, 600 (Mo. banc

1989). *Molasky* dealt with a charge of attempted murder brought against a prison inmate. The prisoner had engaged in conversations seeking to solicit a fellow inmate (who

79. Prior to that time, Missouri employed the concept of attempt derived from the common law, which recognized abandonment of criminal purpose as a defense. Section 564.011 replaced the former section 556.150, which "contained a tougher test for attempt" in accordance with common law concepts. *State v. Molasky*, 765 S.W.2d 597, 600 (Mo. banc 1989). The "tougher language" of earlier law had required steps beyond "mere preparation" and required an action going also to "perpetration," by "doing something bringing him nearer the crime he intends to commit." *Id.* Also recognized was the common law doctrine of abandonment as a defense:

> There is in every design or plan to commit a crime a place of repentance or *locus penitentiae* whereby the one planning to commit it may abandon the idea and thus avoid criminal liability.

*State v. Bailey*, 383 S.W.2d 731, 734 (Mo. 1964) (*quoting* 15A Am.Jur. *Criminal Law*, section 333 (1958)). Neither former section 556.150 nor current section 564.011 contains any provision related to the common law concept of abandonment or renunciation. It is theoretically conceivable that the concept could have survived the recodification of the law of attempt in section 564.011, since it was a common law concept. However, Appellant Rollins provides no authority to that effect, and we have been unsuccessful in locating any such authority. The authority we do find seems to be contrary. *See, e.g., State v. Boschert*, 693 S.W.2d 128, 129 (Mo.App. 1985). We note that there is no Missouri Approved Instruction (MAI) as to abandonment of purpose.

In the 1990s, our courts in Missouri began to mistakenly conclude that there were two kinds of attempt offenses in Missouri: common law attempt offenses, and attempt offenses under section 564.011. In *Withrow*, in 1999, the Supreme Court overruled multiple decisions of the Court of Appeals adhering to the mistaken idea that common law attempt, with its traditional elements and issues (including abandonment as a defense), was still applicable to some criminal offenses. *Withrow*, 8 S.W.3d at 78–80. The Court held that our intermediate appellate decisions had gone wrong, because we had overlooked the fact that section 556.031 (which sets forth the scope of Missouri's Criminal Code) specified a rule of construction applicable to all criminal offenses, whether or not defined within the Criminal Code:

> [T]he Code governs construction of all criminal offenses whether the offense is defined inside or outside the Code in the absence of a specific exception.

*Id.* at 79. Accordingly, we now know that section 564.011 (statutorily defined attempt) governs the law of attempt in Missouri as to all offenses, including offenses like first-degree assault under section 565.050.1, that specify that an *attempt* to kill or seriously injure is to be treated the same, with the same penalty range, as a *completed* attack. *See id.* at 79–80.

Some American jurisdictions still recognize the concept of "abandonment of purpose" as a defense to an attempt charge. *See* H. Morley Swingle, *Criminal Attempt Law in Missouri; the Death of a Tale of Two Theories*, 56 J.Mo.Bar 144, 149 (2000). Under the common law, and in jurisdictions statutorily incorporating the common law, abandonment remains a defense. *Id.* The burden of establishing such defense is on the defendant. *Id.* Rollins' proposed instruction presumably would have been proper (at least in concept) in such juris-

---

was anticipating release) to kill five people. The question in *Molasky* was whether the conversations in that context were a "sub-

stantial step" that would sustain the attempted murder conviction. *Id.* at 601–03.

dictions. But in Missouri, we assume that abandonment is not a defense to an attempt except in the rare case where the concept is specifically authorized, as in section 564.016 (the conspiracy statute).[5] *See, e.g., State v. Gilliam,* 618 S.W.2d 733, 734 (Mo.App.1981); *Boschert,* 693 S.W.2d at 129.

■■■ Of course, any effort by the accused to abandon or renounce his criminal purpose before the offense is completed would be pertinent to the determination of "substantial step," which involves evaluating the actor's "firmness of purpose." And logically, once a "substantial step" has been taken, the abandonment of criminal purpose comes too late to avoid liability. Thus, if someone purposing to steal a car breaks into a garage, and then changes his mind, he may still be guilty, not only of burglary, but also of attempted stealing, though he repented of his criminal purpose after breaking into the garage. His change of heart may have come too late to defeat the attempted stealing charge. If indeed we are correct that abandonment is no longer a defense to an attempt charge, that would apparently reflect a legislative determination that any repentance *after* a "substantial step" should be pertinent to mitigation of punishment, but should not constitute an exemption from conviction of the attempt charge.

Rollins does not argue that the evidence of first-degree assault (by attempting to kill or seriously injure Dred Scott) was insufficient as a matter of law to sustain the conviction. Rollins does not argue that the evidence of his actions that allegedly constituted a "substantial step" were necessarily too remote from the actual execution of the crime as to warrant criminal culpability. Rather, Rollins seeks a new trial on the basis that the jury should have

been allowed to decide under appropriate instructions whether Rollins actually abandoned his criminal purpose as to Dred Scott. Rollins thus indirectly contends that abandonment of criminal purpose exists as a defense under the Missouri law of attempt. He reasons that because the issue of abandonment was injected into the case by facts showing he did not carry out any injury to Dred Scott, Rollins should have been allowed the instruction he requested. We believe the law is to the contrary.

■■■ As we have seen from the authorities above, under our attempt statute, the State must show that the defendant engaged in a "substantial step" toward the completion of an offense, which is defined as a step that is "strongly corroborative of the firmness of the actor's purpose" to complete the offense. *See Withrow,* 8 S.W.3d at 78, 79–80; section 564.011.1. In order to be "strongly corroborative" of such purpose, an action must logically support the firmness of the actor's criminal purpose in question. *See State ex rel. Verweire v. Moore,* 211 S.W.3d 89, 92–93 (Mo. banc 2006). While an act showing a change of direction might raise doubt as to the overall firmness of the actor's purpose, it is not a defense. *Boschert,* 693 S.W.2d at 129. It simply is a factor for the jury to consider in determining whether the alleged substantial step was strongly corroborative of the firmness of the actor's criminal purpose.

■■■ A person pointing a gun at someone's chest or head and uttering a threat, then voluntarily putting the gun away, would be viewed as having made a very powerful threat. Because a person is ordinarily presumed to have intended his vol-

---

5. *See, e.g.,* section 564.016.6, which governs criminal conspiracies and recognizes a de-

fense of renunciation of criminal purpose.

untary actions, the normal presumption is that the making of the threat, and nothing more, was the actor's purpose all along. Accordingly, a fact finder in that scenario would find third-degree assault under section 565.070 rather than first-degree assault under 565.050. There is not shown a "firmness of purpose *to kill or cause serious bodily injury* " when the normal inference is that the intent was only to make a very palpable threat. *See Verweire,* 211 S.W.3d at 91–93.

█ In contrast, however, if circumstances were sufficient to strongly indicate that the defendant had a firmness of purpose to pull the trigger and kill or seriously injure the victim, but the act, for some reason, was not completed, then the defendant *could be* convicted of first-degree assault or attempted murder. If, for instance, in the circumstances described above, the evidence showed that the defendant stopped short of pulling the trigger only because the police suddenly arrived, or because the gun malfunctioned, then the defendant ordinarily could be convicted of attempted murder.[6]

Rollins relies on the Supreme Court decision in *Verweire, supra,* contending that he was entitled to an instruction on abandonment. To deal with that, we must properly understand *Verweire.* In that case, an intoxicated man was engaged in a confrontation with some juveniles at an arcade. *Verweire,* 211 S.W.3d at 91. The man pulled out a loaded semi-automatic pistol, grabbed one teen, jabbed the pistol in his side and his cheek, and told him in unkind words that he would blow his "head off." *Id.* The man then voluntarily put the pistol away, left the arcade, and was arrested shortly thereafter in possession of

the loaded pistol. *Id.* The accused pleaded guilty to committing assault in the first degree "by attempting to cause serious physical injury" to the juvenile. *Id.* Later, the defendant filed a *habeas* petition alleging that there was no factual basis for his plea to first-degree assault, because the facts did not demonstrate a "substantial step" toward the commission of the offense of causing serious physical injury or death. The Missouri Supreme Court, on his *habeas* petition, held that the petitioner was entitled to relief. *See id.* at 92–93.

█ The Court rejected the State's argument that the threat to blow the teen's "head off" was sufficient factual evidence of intent to cause serious physical injury. That rejection by the Court is based in logic. If the facts are consistent with the notion that the purpose of the defendant was only to threaten (and frighten), then it makes sense that the *threat itself* cannot be "strongly corroborative" of a purpose to *do more than* threaten. The Court stated that there must be

> strongly corroborating evidence that it was the defendant's conscious objective to carry out the threat. Under the State's approach, however, every threat with a deadly weapon would constitute a substantial step toward the commission of first degree assault.

*Id.* at 93.

The accused in *Verweire* voluntarily, without intervention by others or by circumstances, withdrew from the altercation without having fired or attempted to fire. *Id.* The Court held that, as a matter of law, there was not *in that case* a basis to find first-degree assault by attempting to kill or cause serious physical injury. *Id.* The Supreme Court was unwilling to agree

---

**6.** Many attempt convictions involve instances in which the course of the defendant's conduct was altered by the intervention of law enforcement. *See, e.g., In re J.R.N., Jr.,* 687 S.W.2d 655 (Mo.App.1985) (juvenile carrying lug wrench intending to commit assault stopped by police officer); *State v. Perkins,* 826 S.W.2d 385 (Mo.App.1992) (shoplifter realized he had been spotted, dropped items inside store; held guilty of attempt).

that *the acknowledged facts* alone, without some evidence showing a "conscious objective" to injure, would be sufficient to allow a factual basis for a guilty plea.

We suggest that the Court was sufficiently concerned about the need to clarify a principle of law that it took the unusual step of granting *habeas* relief in a guilty plea case. That principle is that not "every threat with a deadly weapon" can be viewed as constituting first-degree assault (some instances might be third-degree assault instead).[7] *Id.* The message of *Verweire* might be to remind us that a purported "substantial step" cannot be found to be "strongly corroborative of the firmness of the actor's purpose" unless it tends *logically* to show that the actor formed a purpose to complete the crime in question.

The appellant's reliance on *Verweire* is misplaced in this case. *Verweire* is not a jury instruction case. Nor is it about abandonment of purpose *as a defense* to the attempt charge. The voluntary withdrawal of the pistol in that case was not about abandonment; its significance was that it helped shed light on what the defendant's conscious purpose was at the time he placed the pistol next to the teen's chest and face.

In other cases involving charged attempts, the circumstances have been such that the actions of the defendant could be viewed by a fact finder as "strongly corroborative of the firmness of the actor's purpose to carry out the offense." For example, a man who dragged a woman out of his car and wrestled with her while she fought, screamed, and resisted over a period of twenty to twenty-five minutes, while he was trying to subdue her and to remove her clothes and her underpants, was convicted of attempted rape, even though he eventually abandoned his efforts and drove her home. *Boschert,* 693 S.W.2d at 128–29.

All of the fact issues for the jury in an attempt case under section 564.011 are wrapped up in that statute and the MAI instruction derived from it. Under current law, Rollins was not entitled to an instruction on the abandonment of his criminal purpose. If the jury was persuaded beyond a reasonable doubt that Rollins formed a firm purpose to kill or hurt Scott and that he took steps accordingly until, after the shooting of the trooper, and after proceeding further toward the goal of injuring or killing Scott, he decided to turn himself in, the authorized jury instructions permitted a finding of guilty. If, instead, however, the jury believed that Rollins was tentative about injuring Scott all along until he abandoned the plan, before he ever got to a "substantial step," the jury should have acquitted Rollins of first-degree assault as to Scott. The jury here did not acquit Rollins. We assume the jury believed he had a culpable, criminal (first-degree assault) purpose firmly in mind as to Dred Scott until such time as he abandoned the proposed attack. And, as previously mentioned, there is no contention here that the jury could not, on this evidence, convict of an attempt.[8] Point II is denied.

7. Third-degree assault can consist of "reck-lessly engag[ing] in conduct which creates a grave risk of death or serious physical injury to another person[.]" Section 565.070.1(4).

8. It is true that there was a dispute at trial about the firmness of Rollins' purpose to hurt or kill Dred Scott. In Rollins' post-arrest statements to the police and to mental health examiners, he said that even on the highway he was having second thoughts about his plan to hurt Scott and that in the subdivision he "changed his mind" about his plan to hurt Scott. This is not a case in which abandonment or repentance came immediately after the shooting of Trooper Brashear. There were further actions, arguably strongly corroborative of a firmness of purpose to not be deterred from his plan to hurt or kill Scott. After the shooting, Rollins proceeded north

## Batson Contentions

In his first point on appeal, Rollins seeks a new trial on the ground that the trial court clearly erred in overruling his challenge under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the State's peremptory strike of venireperson number 33, an African–American male.

## Procedural Background

During the State's portion of *voir dire,* the prosecutor asked the venire panel whether any venire member had a friend or relative who had been incarcerated. Venireperson 33 responded that he had. He stated as follows:

> VENIREMAN 33: I had an uncle who committed a crime roughly about 23 years ago. I think it was burglary, and I think there was the use of an armed weapon. I should say that he was accused of a crime because I do not believe that he committed it. When I was a youth, I attended every single session in the courtroom and was privy to all the testimony that was given. So I watched it closely.
>
> [PROSECUTOR]: And based on what you've said, I would assume you would have a little trouble setting that aside?
>
> VENIREMAN 33: I don't think that you could draw that conclusion, no. I wouldn't have a problem setting it aside. I do believe that he was treated unfairly, but that was an isolated event and that is not indicative of the system. That was indicative of the time and individual trying it, yes.
>
> [PROSECUTOR]: Okay, so you feel that he was tried—
>
> VENIREMAN 33: I believe that there was some questionable antics in the courtroom, and I think that that gave me great concern. But I have seen other cases with other people and have seen similar cases because I used to be fascinated by law. And I haven't seen them treated in that way. So in retrospect that confirmed that I still hold the same opinion. But that was an isolated case.
>
> . . . .
>
> [PROSECUTOR]: Now, was your uncle—where was he convicted at?
>
> VENIREMAN 33: I believe it was Jackson County, if I remember correctly. Yes, I believe it was Jackson County.
>
> . . . .
>
> [PROSECUTOR]: All right. And so you followed it. Was it a trial that he had?
>
> VENIREMAN 33: Yes, that's correct.
>
> [PROSECUTOR]: And you felt that there was some—
>
> VENIREMAN 33: When you're a kid—and that was my very first case that I ever was a part of. So I remember pretty much everything because it was bigger than life to me, and it was a relative. There were some statements that rubbed me wrong, and that is where I felt it was not handled properly or I should say professionally.
>
> [PROSECUTOR]: And you thought about—you remember this from 23 years ago, right?
>
> VENIREMAN 33: Oh, absolutely because I felt it was an injustice at that particular time. And from what I learned later, I confirmed that opinion.

according to his original plan and turned into Scott's subdivision at 2:00 in the morning with explosives and weaponry. The State argued that the unwelcome intervention by the trooper and such matters as the knowledge that he was being sought by police and possibly the difficulty of finding Scott's house in the dark, all could have changed his plan about Scott *after* there were "substantial steps."

[PROSECUTOR]: If I could ask briefly, and I'll go away, how can you set that aside for this trial?

VENIREMAN 33: Easily. One, because that's an isolated event. Two, because I think that was indicative of the time. Three, because I also believe that that was a situation that was—I also have to take into account that I was a child and that I may have read into it more than what was actually there. And being I like to think of myself as a rational adult, I wouldn't want to allow that to color my opinion in any way.

Later, during Rollins' portion of *voir dire,* defense counsel asked the venire panel, "Has anybody ever felt discriminated against because of their race?" Venireperson 33 responded in the affirmative:

VENIREMAN 33: I was traveling to Barnes & Noble in Overland Park, Kansas, and I was driving a vehicle that was older. Earlier that day I was driving a different vehicle. I had to make an additional trip out that way and passed the same police officer, was wearing the same attire, and he did not consider me to be of any concern.

But [when] I was driving a much older vehicle wearing the same attire during approximately two hours' difference in time, was during the course of the evening, he then found it—my presence interesting and wanted to make a point of making sure that I was where I needed to be and was, therefore, asking all kinds of questions of why was I there, which was basically for the sole purpose of running some errands and going to the bookstore.

. . . .

VENIREMAN 33: The vibe I got was that it was profiling, was the vibe that I got.

[DEFENSE COUNSEL]: All right. Were you able to get over that?

VENIREMAN 33: People make mistakes and people are incorrect. Yeah, I was able to get over it. I just chalked it up to an individual.

The State exercised one of its peremptory strikes to remove venireperson 33 from the panel. The defense raised a *Batson* challenge to the State's strike and identified venireperson 33 as African–American. The State articulated two reasons for striking venireperson 33:

[PROSECUTOR]: The State's race-neutral reason, Judge, is that, first of all, he said that he was discriminated against by the police, basically that they singled him out in Overland Park for no injustice [sic].

There are many police officers that are testifying in this case. That is also the defendant's—one of the reasons the defendant justifies his behavior in this case is that the police discriminated against him.

He also believes that the Jackson County Prosecutor's Office treated him unfairly and I believe his words were "pulled antics," and—against his uncle in a trial and that he was basically unjustly accused and unjustly convicted and blames that on the Jackson County Prosecutor's Office. He claimed he watched that case very, very closely and believes our office was unfairly treating his uncle.

Defense counsel responded as follows:

In regard to the first race-neutral— well, the first reason that the State raises a race-neutral basis for justifying a peremptory strike that would exclude [venireperson 33] from the opportunity to serve as a juror in this case in violation, we submit, of his equal protection rights under the Second [sic] Amendment to the Constitution of the United States and Article I, Section II of the Missouri Constitution is the fact that the

man was discriminated against by the police [by] reason of his race.

We respectfully contend that cannot be a race-neutral reason. What the man said about that justifies, I think, to an objective observer the fact that he was—the idea that he was singled out for reason of his race but he accompanied that description of discrimination with comments that indicate that he holds no grudge against the State in this case or the prosecutors in this case for reason of what one officer did in Overland Park, Kansas.

As to the second reason that the State raises to justify the exclusion of [venireperson 33] from jury service in this case is this reference to his impression 23 years ago that things didn't go right in a trial and an innocent man got convicted.

He also talked about his qualifications on that opinion, including the fact that he was young at the time and he may have been misreading things. Those antics may not have been something improper. But also the fact that he talked about watching other cases in which he saw no injustice and thought that the one case he saw was an isolated incident.

I didn't hear him say that he held it against the prosecutors of Jackson County because he still retains the idea that that 23–year–old case was one that didn't do justice.

So, on that basis, I would respectfully aver that we don't have a sufficient, plausible, convincing race-neutral basis for removing [venireperson 33].

The trial court overruled Rollins' *Batson* challenge and permitted the strike. The court explained that it believed "there are race-neutral reasons that the State has stricken No. 33 … and so the court will allow that peremptory strike to stand."

## Standard of Review

We review a trial court ruling on a *Batson* challenge for "clear error." *State v. McFadden,* 191 S.W.3d 648, 651 (Mo. banc 2006). A finding is clearly erroneous when the reviewing court is left with a definite and firm impression that a mistake has been made. *Id.* Because the legitimacy of the State's explanation is a subjective exercise, the court places "great reliance" on the trial court's judgment. *State v. Pointer,* 215 S.W.3d 303, 305 (Mo. App.2007) (*quoting State v. Morrow,* 968 S.W.2d 100, 114 (Mo. banc 1998)). We accord great deference on appeal to the trial court's decision as to whether the State exhibited discriminatory intent. *See Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

The State may not exercise a peremptory challenge to strike a venireperson solely on the basis of the venireperson's race. *See Batson,* 476 U.S. at 84–88, 106 S.Ct. 1712. Missouri courts follow a three-step process when a defendant raises a *Batson* challenge to a peremptory strike by the State. *State v. Parker,* 836 S.W.2d 930, 933 (Mo. banc 1992). The first step requires that the defendant raise a *Batson* challenge. As part of the challenge, the defendant must identify the protected group or class to which the venireperson belongs. Next, the State must articulate a "reasonably specific and clear race– or gender-neutral explanation for the strike." *State v. Clark,* 280 S.W.3d 625, 630 (Mo. App.2008). The State's explanation need not be "persuasive, or even plausible" at that point. *Pointer,* 215 S.W.3d at 306. At that stage of the inquiry, the issue is the facial validity of the prosecutor's explanation. *See id.* Next, assuming that the State's explanation is facially neutral, the defendant has the burden to show that such explanation was actually pretextual and, in fact, the strike was motivated by

purposeful discrimination. *Clark*, 280 S.W.3d at 630. In considering whether a proffered reason is pretextual, there are at least four factors to be considered. *See State v. Strong*, 142 S.W.3d 702, 712 (Mo. banc 2004). One factor is the presence of "similarly situated white jurors who were not struck." *Id.* The next factor is the "degree of logical relevance between the proffered explanation and the case to be tried." *Id.* "The third factor is the prosecutor's credibility based on his or her demeanor or statements during *voir dire* and the court's past experiences with that prosecutor." *Id.* A fourth factor is the "demeanor of the excluded venireperson." *Id.* Finally, the trial court should consider the "totality of the facts and circumstances surrounding the case." *Id.*

Here, the defense satisfied the first step of the process by raising a *Batson* challenge to the State's peremptory strike of venireperson 33 and by identifying that person as an African–American male. The State then articulated two reasons for the strike: (1) venireperson 33 said that he had been the victim of racial discrimination by police, and (2) venireperson 33 said that his uncle had been wrongfully convicted twenty-three years earlier by the Jackson County Prosecutor's Office as a result of a trial that he observed. Both of these reasons are facially race-neutral in that the prosecutor's stated reasons were not the race of the venire member.

### The Race–Neutrality of the Stated Reason

Rollins argues, in contrast to the State's suggestion that the reasons were facially race-neutral, that venireperson 33's past treatment was *not* "race-neutral." Rollins argues that it is not race-neutral to exclude venirepersons simply because they have been the victims of racial discrimination. The State responds that the *Batson* decision does not require that the State's justification for its action

"be unrelated to race," *citing Hernandez v. New York*, 500 U.S. 352, 375, 111 S.Ct. 1859, 114 L.Ed.2d 395 (O'Conner, J., concurring). "*Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race." *Id.* "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Id.* at 360.

Rollins argues that the court was required to take into account the disparate impact of such a supposedly facially race-neutral reason when it means that members of a particular race or ethnicity are more likely to be affected than others. Rollins, however, is attempting to import the concept of disparate impact into the analysis of facial neutrality when disparate impact does not conclusively govern in the preliminary race-neutrality step of the *Batson* inquiry. *See State v. Washington*, 288 S.W.3d 312, 316 (Mo.App.2009) (prosecutor's explanation that the venireperson's dreadlock hairstyle was too "individualistic" was race-neutral on its face).

In *Hernandez*, after the prosecutor used four peremptory challenges to strike Latino venirepersons, the defense raised a *Batson* challenge with respect to two of the strikes. 500 U.S. at 355–56, 111 S.Ct. 1859. Two of the strikes were not challenged because those venirepersons had brothers who had been convicted of crimes. *Id.* The prosecutor explained that there would be Spanish-speaking witnesses using a translator in the case and that he had struck the venirepersons at issue because he was concerned that they would rely on their own ability to understand the Spanish language rather than the interpreter's translation. On appeal, the defendant argued that the prosecutor's explanation was *not* race-neutral, pointing out the disparate impact that the Spanish language ability will have in relation to the

ethnicity of the venire. *Id.* at 359–60, 111 S.Ct. 1859.

The Supreme Court rejected that argument and affirmed, holding that the prosecutor did offer a race-neutral explanation for the strikes, even though the race-neutral reason in question would obviously have a disparate impact. The court determined it need not address the disparate impact argument because "the prosecutor did not rely on language ability without more, but explained that the specific responses and the demeanor of the two individuals during voir dire caused him to doubt their ability to defer to the official translation of Spanish-language testimony. *Id.* The court noted that it would be possible to accept the prosecutor's argument and place Latino venirepersons into two groups: "those whose conduct during voir dire would persuade him that they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt." *Id.* at 361, 111 S.Ct. 1859.

The defendant argued that any "honest" Latino would have answered the prosecutor's questions about ability to rely on the translation the same way as the challenged venirepersons. *Id.* at 361–62, 111 S.Ct. 1859. The court stated that, even if it knew a high percentage of bilingual jurors would hesitate in answering questions about relying on a translation (and would, as a consequence, be excluded from the jury), "that fact alone would not cause the criterion to fail the race-neutrality test." *Id.* at 361, 111 S.Ct. 1859. "Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principal of race-neutrality." *Id.* The court noted that the trial court's findings on the issue of discriminatory intent must be given deference because those findings "largely will turn on evaluation of credibili-

ty." *Id.* at 365, 111 S.Ct. 1859. The court also stated that "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.* at 370, 111 S.Ct. 1859.

■ In the present case, the State's first explanation for striking venireperson 33 was not that the venireperson was African–American, but rather that he had undergone an experience that may have influenced negatively the way he perceives police officers. In Rollins' case, this is not insignificant, because one of the victims and most of the witnesses were engaged in law enforcement activities. Venirepersons of any ethnicity, language, or race are susceptible to being stricken on the ground that they had experienced discrimination by a police officer. Rollins' argument that the State's explanation for striking venireperson 33 was not race-neutral is based strictly on the notion of disparate impact. Disparate impact, however, while pertinent to the inquiry related to pretext, is not determinative of whether the explanation is race-neutral on its face. *Hernandez,* 500 U.S. at 359–61, 111 S.Ct. 1859.

■ Rollins also fails to demonstrate a reason to conclude that the prosecutor's explanation was a mere pretext for discrimination. Rollins goes on to argue that the record shows that this venireperson *could* set aside his past experiences with police discrimination, based on the venireperson's own statements. As the prosecution points out, however, such an observation, while important in the context of dealing with a challenge *for cause,* is not relevant in determining the propriety of a *peremptory* strike. A venireperson's statement that he or she can set aside a prior experience and be "fair and impartial" does not resolve the issues in a *Batson* context where the party seeking to strike the venireperson might have reason

to think otherwise. *See Clark,* 280 S.W.3d at 630.

The totality of the circumstances supports the trial court's ruling in this case. There is no indication that there were any similarly situated white jurors that were not struck. There is also no evidence that the State asked a question *hoping* to elicit disqualifying answers from members of a particular racial group. In fact, it was the defense, not the State, that asked the panel during *voir dire* whether any venirepersons had felt discriminated against because of their race. Finally, the venireperson's past experience with racial discrimination was pertinent to the issue of objectivity in the case about to be tried. The anticipated defense of Rollins at trial, to go along with the defense of mental disease or defect, was that Rollins was so frustrated by repeated encounters with racist police officers over the years that he "just snapped" when he was pulled over by the trooper. The prosecutor may reasonably have believed that the venireperson's previous personal experience with discrimination would have made him unduly sympathetic to Rollins' defense.

### Alleged Pretext

The second reason given by the prosecution related to the fact that the venireperson's uncle had been unjustly convicted in a criminal trial prosecuted by the Jackson County Prosecutor's Office twenty-three years earlier. Rollins acknowledges that this was a facially race-neutral explanation for the strike. Rollins, however, contends that this was a pretextual reason, because the venireperson said that he could set that experience aside and be fair and impartial. As we indicated above, the venireperson's statement that she or he can be fair and impartial does not resolve the matter in the context of the final step of a *Batson* challenge to a peremptory strike. There remain some differences between a peremptory strike and a challenge for cause, and one of those is that the attorney or party is allowed a subjective evaluation of the honesty and accuracy of the statement of the venireperson. The State's expression of uneasiness with the venireperson's declaration may be evaluated by the trial court as to the issue of pretext within the totality of the circumstances and the factors listed above. We fail to see that it was clear error for the trial court to determine in this context that the reason given was not pretextual. *See Strong,* 142 S.W.3d at 712. The court did not abuse its discretion. This point is also denied.

### Conclusion

Because the court had no authority to give an instruction on abandonment of criminal purpose, the trial court did not err in refusing to give the instruction requested. Also, because the court did not clearly err in its rulings as to the State's peremptory challenges, the judgment of convictions is affirmed.

All concur.