

# SUPREME COURT OF MISSOURI
# en banc

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC94977 |
| | ) | |
| BLAEC JAMES LAMMERS, | ) | |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF POLK COUNTY
### The Honorable William J. Roberts, Judge

*Opinion issued February 9, 2016*

Blaec Lammers (Defendant) appeals his convictions for attempted first-degree assault and armed criminal action. Defendant, who was being treated for serious mental health issues, thought of a plan to commit a mass shooting after he had seen a video about the Columbine shootings[1] and considered emulating them. He later purchased two assault rifles and engaged in target practice, despite having no experience using firearms. When his mother found out, she alerted the police. During the course of an interview at the police station, the police asked about his plan. Defendant admitted that he would have gone to the local Walmart, walked in, and started shooting at random.

---

[1] The massacre at Columbine High School occurred April 20, 1999, in Columbine, Colorado.

On appeal, Defendant argues there was insufficient evidence of both elements of attempt: the intent to complete the crime and a substantial step toward completing it. He also argues the trial court erred in overruling his motion to suppress evidence of his police interview. This Court holds that a reasonable fact-finder could have found that Defendant had the intent to commit first-degree assault and that his purchase of the assault rifles and target practice constituted substantial steps. Additionally, Defendant's police interview did not violate the Fourth or Fifth Amendments to the United States Constitution. The judgment is affirmed.

## I. Factual & Procedural Background

At the time of the events leading to the convictions in this case, Defendant was 20 years old and lived at home with his parents south of Bolivar. Defendant was taking prescription drugs for depression and had been hospitalized a number of times for psychiatric problems. One of these hospitalizations occurred in 2009 after a psychotic episode at the local Walmart, in which the sheriff's office was called to intervene. Although Defendant's mother took efforts to ensure he took his medication, he did not like taking it and admitted that, in the past, he had sometimes "cheeked" his medication by hiding the pills in his mouth and pretending to swallow them.

On November 12 and 13, 2012, Defendant legally purchased two assault rifles (a .22 caliber and a .223 caliber) and ammunition from the Bolivar Walmart.[2] Defendant and his girlfriend took the guns to the apartment of a mutual friend who had experience handling assault rifles because Defendant had never shot a gun before. The friend

---

[2] No mental health background check is required under Missouri law.

showed him how to sight and load the guns, and the two practiced shooting. After they finished, the friend took the guns to his apartment because Defendant did not want them at his parents' home as he knew his mother would not approve of him possessing guns. The next day, Defendant moved the guns to the home of his girlfriend's father.

The father, who evidently was aware to some extent of Defendant's past mental health issues, hesitantly agreed to store the guns. He testified at trial that he was leery of taking the guns because he wondered whether they could have been stolen. He voiced these concerns to Defendant and indicated that he would be "checking into" the guns and handing them over to authorities if there were any issues. The father stated that he did not believe it was Defendant's intent to leave the firearms with him permanently. He told Defendant he would keep them in a secure location and Defendant would have to come to him to get them back. The father was suspicious of why Defendant did not want his mother to know about the guns, so he contacted Defendant's mother.

Defendant's mother was very concerned when she heard Defendant was in possession of two assault rifles because she did not know where he obtained them. Later that night while doing laundry, she found a receipt from Walmart in Defendant's pants pocket confirming that he had purchased the assault rifles. The next day, Defendant's mother drove to the sheriff's office. She showed officers the receipts and voiced her concerns about Defendant's mental illness. She was worried that he might not be taking his medication and should not be in possession of guns. She testified that it was not her

intent for Defendant to be arrested but, rather, for officers to keep an eye on him. She was worried that Defendant would get access to the guns and harm himself.

Later that day, officers from the Bolivar police department, having been notified of Defendant's mother's call, executed a "well-being" check on Defendant. Two officers found Defendant at the local Sonic Drive-In with his girlfriend in her vehicle. They told Defendant that his mother had contacted them because she was worried about him. They discussed his medication and the assault rifles. Defendant indicated that he had been taking his medication and that he planned to use the guns to go hunting, although he lacked a hunting license. The officers asked Defendant if he would come down to the police station to talk further. Defendant said that he would. He was not restrained in any way and rode to the police station in the front seat of one of the officer's unmarked cars.

At the police station, a Bolivar police detective interviewed Defendant. Defendant was not in handcuffs during the course of the interview, and the detective did not take any of his possessions from him. At the outset of the video-recorded interview, the detective told Defendant that, although he was not under arrest, he was going to read him his *Miranda*[3] rights anyway. He asked Defendant whether he understood his rights, and Defendant replied that he did. The detective's primary goal throughout the interview was to ascertain why Defendant purchased the assault rifles. Defendant first stated that he intended to use them to go hunting, but said he abandoned this idea when, after purchasing the guns, he learned he would have to take a gun safety class and obtain a

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

hunting license.[4] The detective told Defendant he did not believe this story because

Defendant bought the guns without telling his parents, these particular assault rifles were

not typically used for hunting, and Defendant admitted that he had never been hunting

before. Defendant next claimed that he had purchased the assault rifles because he

thought guns were cool and just wanted to have one. He also stated that he thought

owning a gun would impress his father, but that he did not tell his father because he

would have said "No." The detective again said he thought Defendant was lying.

Defendant told the detective that his mother was concerned about him because she

was worried that he might become a mass shooter. He agreed that there were similarities

between himself and other mass shooters in that he had a mental illness, was somewhat of

a "loner," had struggled with homicidal thoughts, and bought guns without telling

anyone. During the interview, he admitted that, prior to purchasing the weapons, he had

envisioned committing a mass shooting, specifically at the Bolivar Walmart, but that he

changed his mind after taking target practice.

Officer: So tell me about your thoughts you had.

Defendant: Well I was watching . . . there's this movie called April Showers. It's about Columbine.

Officer: Ok.

Defendant: Well, my sister was in it. And I was like oh it's just . . . I want to see what it was about. It was a high school shooting and I was like . . . I

---

[4] Later in the interview, Defendant appeared to contradict this story by indicating that he *was* aware, prior to purchasing the guns, that a safety course was required before obtaining a hunting license.

don't want, I was . . . these thoughts were going through my head, like, what would happen if I ever did that. So I went out and bought them [the assault rifles] and then I realized I don't want to spend the rest of my life in prison. I don't want to do that.

Officer: But here, but here's the thing. You're not in school.

Defendant: No I'm out of school.

Officer: So you wouldn't shoot up . . . where did you, where did you think about shooting up?

Defendant: Walmart.

Officer: Walmart?

Defendant: Yes sir. It was when I bought that. But then I realized when I went shooting . . . I was like this, this isn't me. I don't know why I did this.

Later in the interview, Defendant described being in the Walmart on an occasion prior to when he bought the assault rifles. He was looking through magazines and thinking about concealed weapons:

Defendant: . . . . I was like oh that looks pretty cool.

Officer: And then it just came to you I'm going to shoot up Walmart?

Defendant: Yeah.

When asked about his plan specifically from start to finish, Defendant stated that he would just walk into the Walmart, start shooting people at random, and wait until police arrived. The detective then questioned why, if his target was Walmart, he did not act the same day he bought the guns. The detective asked Defendant if his actual target was a movie theater due to the similarities between these circumstances and the recent

6

movie theater shooting in Aurora, Colorado, and the fact that the popular film "The Twilight Saga: Breaking Dawn – Part 2" was scheduled to premiere the same week Defendant bought the assault rifles. Defendant admitted he had considered this, but reaffirmed that his real target would have been the Walmart because there was sure to be many people there and, if he ran out of ammunition, he could easily reload.

At the conclusion of the interview, the detective placed Defendant under arrest, charging him with attempted first-degree assault under section 565.050,[5] armed criminal action under section 571.015 for committing first-degree assault by use of deadly weapon, and making a terroristic threat under section 574.115, RSMo Supp. 2002. Following a court-ordered mental examination, the trial court found Defendant mentally competent to stand trial, and Defendant waived his right to a jury trial. He filed a motion to suppress his statements to law enforcement during his interview. The hearing on the motion to suppress was conducted prior to the bench trial with the understanding that all witness testimony occurring as part of the hearing would be incorporated into the State's case-in-chief at trial. Defendant did not testify or offer any evidence at either the hearing or the trial. The trial court overruled the motion to suppress, and the recorded interview was admitted into evidence. The court acquitted Defendant of making a terroristic threat, but found him guilty of attempted first-degree assault and armed criminal action and sentenced him to two concurrent terms of 15 years imprisonment. Defendant appeals.[6]

---

[5] Further statutory references are to RSMo 2000 unless otherwise indicated.
[6] This Court granted transfer after opinion by the court of appeals. MO. CONST. art. V, § 10.

## II. Motion To Suppress

Defendant initially argues that the trial court erred in overruling his motion to suppress evidence of his statements to police during the recorded interview and admitting that interview into evidence.

### A. *Standard of Review*

A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous. *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007). The trial court's ruling will be deemed clearly erroneous if, after review of the entire record, this Court is left with the definite and firm impression that a mistake has been made. *Moore v. State*, 458 S.W.3d 822, 829 (Mo. banc 2015). This Court defers to the trial court's factual findings and credibility determinations and considers all evidence and reasonable inferences in the light most favorable to the trial court's ruling. *Sund*, 215 S.W.3d at 723. Whether conduct violates the Fourth or Fifth Amendments is a question of law that this Court reviews *de novo*. *Id.*

### B. *Analysis*

Defendant argues that any statements he gave to officers during the course of the interview at the police station were subject to suppression because they were obtained in violation of the Fourth and Fifth Amendments to the United States Constitution. While admitting that he was not formally arrested, Defendant contends that his interview with police was a custodial interrogation for purposes of the Fifth Amendment and, so, *Miranda* warnings were required to be given. He asserts that the *Miranda* warnings

8

administered to him were defective and that he did not understand them.  Furthermore, he argues that even if the warnings were proper, suppression was still required because the statements were "tainted by his unlawful, de facto arrest," which was not supported by probable cause as required by the Fourth Amendment.

The United States Supreme Court has made clear that, for purposes of the Fourth Amendment, a seizure does not occur simply because a police officer approaches an individual and asks a few questions.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  If a reasonable person would feel free to disregard the police and go about their business, the encounter is consensual and the Fourth Amendment is not triggered.  *Id.*  This Court has also stated:

> [A] person who voluntarily accompanies officers to the police station for questioning is not subject to arrest-like restraints.  If a person is free to go at any time prior to the actual arrest, then the person is not under "arrest."  The issue turns on whether the seizure is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause.  Police are simply not required to have probable cause to interrogate persons who are neither formally arrested nor "seized"—that is, persons who are not subject to arrest-like restraints.

*State v. Glass*, 136 S.W.3d 496, 509 (Mo. banc 2004).  In *Glass*, police initially approached the defendant in a voluntary discussion outside his home.  *Id.*  Officers asked the defendant if he would accompany them to the police station to make a statement, and he agreed.  *Id.*  This Court noted that, although the defendant rode in the officer's car, he was not placed in handcuffs or under arrest and was free to refuse.  *Id.*  It found no

9

evidence that the officer's presence was intended to restrain, threaten, or intimidate the defendant into accompanying him to the station. *Id.* Further, it found that at no point during the interview did the officer show his weapon or physically or verbally restrain the defendant in any way. *Id.* As a result, this Court held that, because the defendant was not seized, detained, or placed under arrest prior to giving his statement, officers did not need to show they had probable cause to arrest him prior to interviewing him. *Id.*

The facts here are similar. Officers approached Defendant in public and asked him questions. There is no doubt this encounter was consensual. They asked him if he would accompany them to the police station to talk further, and he agreed. Defendant rode unrestrained in the front seat of the officer's car. He also was not restrained in any way during the interview, and he possessed his cell phone and other personal items until he was arrested at the end of the interview—none of which would have occurred had he been under arrest prior to being questioned. At no point prior to or during the interview did any officer show a weapon or restrain Defendant's freedom of movement. Moreover, the detective explicitly told Defendant he was not under arrest. As was the case in *Glass*, this was not a situation in which the police made a show of authority that caused Defendant to submit. Because Defendant was not formally arrested, seized, or subject to arrest-like restraints, no Fourth Amendment violation occurred.

For the same reasons, Defendant's claim that his statements were taken in violation of the Fifth Amendment due to defective *Miranda* warnings must fail. When a suspect is subject to a custodial interrogation, he must be warned that he has a right to

10

remain silent, that any statement he makes may be used against him, and that he has a right to the presence of an attorney. *Miranda*, 384 at 444. A custodial interrogation occurs only when the suspect is formally arrested or is subjected to arrest-like restraints. *Glass*, 136 S.W.3d at 508. Because Defendant was not under arrest when he made his statements to police, either formally or "de facto," he was not subject to arrest-like restraints, and *Miranda* did not apply. *See State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993) ("The simple fact that investigative questioning takes place in a potentially coercive environment does not require *Miranda* warnings"). Therefore, regardless of whether the warnings were defectively given or misunderstood by Defendant, no Fifth Amendment violation occurred.

As a result, the evidence in the record was sufficient to support the trial court's decision to overrule Defendant's motion to suppress.

### III. Sufficiency of the Evidence

Defendant next argues there was insufficient evidence to support his convictions for attempted first-degree assault and armed criminal action.

### *A. Standard of Review*

Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt. *State v. Hunt*, 451 S.W.3d 251, 257 (Mo. banc 2014). This Court considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. *Id.* Contrary evidence and

11

inferences are disregarded.  *Id.*  The Court will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences.  *Id.*

### B. Analysis

Section 565.050 states that a person commits the crime of assault in the first degree if he "attempts to kill or knowingly causes or attempts to cause serious physical injury to another person."  A person attempts to commit a crime, under section 564.011,  when, "with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense."  Accordingly, to be convicted of attempted first-degree assault, Defendant must have: (1) had the purpose to commit that offense and (2) committed some act that is a substantial step toward completing that offense.  To act purposefully is to have the conscious object to engage in certain conduct or to cause a certain result.  *State v. Whalen*, 49 S.W.3d 181, 187 (Mo. banc 2001).  "Substantial step" is defined as "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense."  Section 564.011.

### 1. Purpose

Defendant argues there was insufficient evidence that he had the purpose to commit first-degree assault.  He asserts there was no evidence he had the intent to harm anyone prior to his purchase of the assault rifles.  Instead, he contends that he merely had thoughts of shooting people at a movie theater or Walmart and that these thoughts did not occur until after the purchase.  Defendant's characterization of the record is inconsistent

12

with the facts as believed by the trial court. Viewing the facts in the light most favorable to the trial court's verdict, this Court is left with the following evidence of intent.

Defendant had had prior violent incidents as a result of his mental illness, and he was aware his mother had specific concerns that he might be capable of a mass shooting. Two months before the events in question, he watched a movie about the Columbine shootings, envisioned doing something similar, and bought two assault rifles to carry out a mass shooting, with Walmart in mind as a specific target. He did not tell his parents about the purchase, but he told others he planned to use the rifles for hunting, despite the facts that such rifles were not typically used for hunting and that Defendant had no hunting license, had never been hunting, and had never shot a gun.

The day after the purchase of the second rifle, Defendant had a friend show him how to operate the guns and engaged in numerous rounds of target practice. When asked specifically about his plan "from start to finish," Defendant stated that he would have walked in the front door and started shooting. He would have shot random people until police arrived. He also admitted that, though he considered a movie theater as a target, Walmart was the more practical choice because of the higher density of people and the fact that, "if I ran out of ammo, all I had to do was break the glass."

Intent is rarely susceptible to proof by direct evidence and is most often inferred circumstantially, *see State v. Letica*, 356 S.W.3d 157, 166 (Mo. banc 2011). In that regard, there was sufficient evidence to find that Defendant had the purpose to kill or cause serious physical injury to another person. Defendant's own statements offer direct

13

evidence of such intent. His idea of emulating the Columbine shooters occurred well before he bought the guns and practiced shooting them; when questioned by police, he described in some detail how he planned to act. Further, his conduct in purchasing the guns and learning to shoot them, taken together with his repeated subterfuge regarding why he bought the guns, are probative of a criminal intent. *See State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993) (presumption that a person intends the natural and probable consequences of his actions).

## 2. Substantial Step

A finding of intent, however, does not end the inquiry. It is further necessary to determine whether Defendant took a substantial step toward commission of the offense. The alleged substantial steps Defendant took were buying the assault rifles and practicing shooting them. The question this Court must answer in determining whether Defendant took a substantial step is whether this conduct was "strongly corroborative of the firmness of [Defendant's] purpose" to complete the offense. Section 564.011. Section 564.011, effective in 1979, lowered the threshold needed to find the offense by rejecting the requirement of an act of perpetration and adopting the "substantial step" test of the Model Penal Code. *State v. Molasky*, 765 S.W.2d 597, 600 (Mo. banc 1989).[7] The result was that the emphasis was shifted away from what an actor had left to accomplish and refocused, instead, on what the actor had already done. *Id.* In that regard, because there

---

[7] The comments to the 1973 proposed section 564.011 highlight the reason for the change: "[T]he policy underlying the shift in emphasis from what has yet to be done to what has been done . . . is that the law is not interested merely in punishing dangerous acts, but also in neutralizing dangerous individuals."

14

was sufficient evidence of Defendant's conscious purpose to commit assault, a reasonable fact-finder could have deemed his later purchase of assault rifles and ammunition, together with extensive target practice, strongly corroborative of that purpose. The trial court did not err in finding sufficient evidence that Defendant's conduct constituted a substantial step under section 564.011.[8]

The dissent argues that the alleged substantial steps in this case were insufficient, relying heavily on this Court's decision in *State v. Ess*, 453 S.W.3d 196 (Mo. banc 2015). The reliance is misplaced.

In *Ess*, the defendant laid in bed with his five year-old stepson, placed the boy's hand on the defendant's genitals over the clothes, and left the room at some time after the boy fell asleep. *Id.* at 207. Defendant was charged with first-degree child molestation under section 566.067. *Id.* The statute required "sexual contact" for conviction, and that term was defined as "any touching of another person with the genitals . . . for the purpose of arousing or gratifying sexual desire of any person." *Id.* at 208; section 566.010(3). The State mistakenly believed that the definition also included the language "or any such touching through the clothing."

---

[8] The dissenting opinion suggests, based on the comments to section 564.011, that to be considered a substantial step, the conduct must be illegal. The statute, however, does not mandate that conduct be illegal to constitute a substantial step. All that is required under section 564.011 is that the alleged substantial step strongly corroborate the intent to complete the offense. While the comments do contain a non-exclusive list of conduct that constitutes a substantial step, the comments also state that "[w]hat act will constitute a substantial step will depend on the facts of the particular case." Under the facts of this case, a rational trier of fact could have found the purchase of two military-style assault rifles and ammunition strongly corroborative of the firmness of purpose of an actor who has communicated in some detail a desire and plan to commit a mass shooting at a particular location.

15

However, the definition of "sexual contact" used by the State was wrong. The statute had been amended in 1995 to remove the phrase "or any such touching through the clothing." *Ess*, 453 S.W.3d at 208. As such, section 566.067, as it stood in *Ess*, required the touching to be skin-to-skin underneath the clothing. After being notified of the error by the court, the State elected to amend its charge to attempted first-degree child molestation. *Id.* at 207. This Court correctly pointed out on appeal that there was insufficient evidence that the defendant attempted to commit that offense.

This Court reversed the conviction and held that the defendant did not take a substantial step toward completion of that offense as it was defined by section 566.067. *Id.* The dissent stated that, "[i]f Mr. Ess' conduct did not constitute a substantial step, then Mr. Lammers' conduct certainly does not qualify." Respectfully, this conclusion misunderstands the unique circumstances present in *Ess* that are absent here. In *Ess*, the defendant's act of placing the boy's hands on his genitals over the clothes was not strongly corroborative of a purpose to commit first-degree child molestation, *as that offense was defined*. The defendant in *Ess* engaged in the improper touching through clothing, not skin-to-skin. After the completion of this act, he left the room. There was no evidence that this act was a substantial step toward engaging in skin-to-skin contact as required by first-degree child molestation.

It is clear that the defendant's conduct was not an attempt of first-degree child molestation. Rather, it was a completed act, albeit one that simply was not illegal under the statute as written. *Ess* essentially makes this explicit: "The more appropriate charge

16

to bring against Ess would have been for first-degree sexual misconduct . . . which at the time in question included engaging in conduct that would constitute sexual contact except that the touching occurs through the clothing . . . ." *Id.* at 208 n.12.

There simply was insufficient evidence in *Ess* that the defendant, though he may have committed a completed uncharged offense, exhibited any effort to engage in the required skin-on-skin sexual contact. As a result, *Ess* is not helpful here.

### 3. Abandonment Evidence

The State argues that, even though Defendant stored the assault rifles at the home of his girlfriend's father after conducting target practice, this does not constitute abandonment. Defendant, for other reasons, also contends that this is not an abandonment case.[9] He argues that because he did not have the purpose to commit assault or take a substantial step, there was nothing to abandon. Defendant asserts, however, that this act of relinquishment impacts the evaluation of whether he had the requisite criminal purpose and whether he took a substantial step. Evidence of voluntary withdrawal may be relevant to the determination of substantial step, which includes evaluating the actor's firmness of purpose. *State v. Rollins*, 321 S.W.3d 353, 360 (Mo. App. 2010) (an act showing a change of direction may raise doubt as to the firmness of the actor's purpose and is a factor to consider in determining whether the substantial step was strongly corroborative of the firmness of the actor's purpose). Even employing this

---

[9] Section 564.011 does not recognize abandonment as a defense to attempt, and Defendant cites no authority indicating otherwise.

analysis, once a substantial step has been taken, abandonment comes too late to avoid liability. *Id.*

Defendant's characterization of the relinquishment of the assault rifles is flawed. He suggests that, after conducting target practice, he became afraid of what he might do and, therefore, permanently rid himself of the weapons. This characterization of the evidence is contrary to our standard of review because it requires this Court to credit an inference contrary to the verdict. *Hunt*, 451 S.W.3d at 257. The father testified at trial that he did not believe Defendant was permanently giving him the guns and that the father would be checking into the guns to see if they were stolen.[10] The trial court was free to credit this testimony, disbelieve Defendant, and believe instead the State's contention that Defendant actually stored the guns at the father's home because he did not want his mother to find out, as she feared that, in Defendant's words, "a Virginia Tech is going to happen with me." *See State v. Jackson*, 433 S.W.3d 390, 399 (Mo. banc 2014) (fact-finder has the right to disbelieve all or any part of the evidence). Viewing the evidence in the light most favorable to the verdict and ignoring contrary inferences, Defendant's relinquishment of the guns cannot be construed as abandonment evidence. As a result, it has no impact on whether Defendant is guilty of the charged crimes.

---

[10] This is directly contrary to Defendant's argument that the father clearly indicated he would be contacting the police when he took possession of the guns.

18

4. *State ex rel. Verweire v. Moore*

Defendant also argues that his intent and conduct were insufficient for attempted

first-degree assault under this Court's ruling in *State ex rel. Verweire v. Moore*, 211

S.W.3d 89 (Mo. banc 2006), particularly in light of his claimed efforts to prevent himself

from following through with his plan by giving the guns away.  In *Verweire*, the

defendant pleaded guilty to attempted first-degree assault under section 565.050 after he

jabbed a semiautomatic pistol into the victim's side and cheek and threatened to blow his

head off.  *Id.* at 90-91.  He later filed a petition for a writ of habeas corpus, claiming

actual innocence and arguing that there was no factual basis for the plea.  *Id.* at 91.  This

Court vacated the conviction.  *Id.* at 93.  *Verweire* held that the defendant did not take a

substantial step toward commission of the offense because there was no evidence that he

pulled the trigger and because he voluntarily retreated from the altercation.  *Id*. at 92.  It

stated that "a mere threat with the ability to carry out that threat does not necessarily

constitute an attempt to commit a crime."  *Id.* at 93.  Rather, the State was required to

prove something more – a conscious object to carry out the threat.  *Id.*

*Verweire* has been subject to criticism and has proven difficult to apply in the

lower courts.[11]  In explaining what must be shown to establish an attempt to commit

first-degree assault, *Verweire* holds that the State must show that the defendant pulled the

---

[11] *Verweire* is routinely distinguished when cited.  *See e.g., State v. Rayburn*, 457 S.W.3d 760, 762-64 (Mo. App. 2014); *State v. Reese*, 436 S.W.3d 738, 742 (Mo. App. 2014); *State v. Hill*, 408 S.W.3d 820, 823-24 (Mo. App. 2013); *Doss v. State*, 376 S.W.3d 719, 722 (Mo. App. 2012); *State v. Davies*, 330 S.W.3d 775, 792 (Mo. App. 2010); *State v. McDaniel*, 254 S.W.3d 144, 146 (Mo. App. 2008).

trigger, a law enforcement officer intervened to thwart the defendant, or that the defendant, although attempting to cause serious physical injury, caused only minor injury. *Id.* at 92. Though direct proof of intent is rarely available, it is simply untenable to require the State to prove intent by establishing that a defendant actually pulls the trigger (but the gun malfunctions), is stopped at the last second by law enforcement , or causes only minor injury.

Moreover, intent is a question of fact for the fact-finder to decide. *See State v. Manley*, 223 S.W.3d 887, 891 (Mo. App. 2007). Yet in *Verweire*, this Court appears to have decided intent as a matter of law rather than deferring to the trier of fact under the applicable habeas corpus standard of review. As a result, this Court now holds that *Verweire* was wrongly decided. To the extent that *Verweire* and its progeny[12] hold that threats with a deadly weapon with the ability to carry them out cannot constitute attempt unless the defendant pulls the trigger, police intervene, or the defendant causes only minor injury, those decisions should no longer be followed.

## IV. Conclusion

The trial court did not err in overruling Defendant's motion to suppress, and there was sufficient evidence for a reasonable finder of fact to determine that Defendant had the necessary purpose to complete the crime of attempted first-degree assault and took

---

[12] *See e.g., State v. Dublo*, 243 S.W.3d 407 (Mo. App. 2007).

20

substantial steps toward completion of that offense.[13]  The judgment of the trial court is affirmed.[14]



Mary R. Russell, Judge

Breckenridge, C.J., Fischer, Stith, Draper and Wilson, JJ., concur;
Teitelman, J., dissents in separate opinion filed.

---

[13] In the portion of his brief addressing his sufficiency of the evidence challenge, Defendant also argues the State failed to prove the *corpus delicti* of the charged offenses.  This Court, pursuant to Rule 84.04, declines to address this argument because Defendant's  point relied on is procedurally defective.  Rule 84.04(d)(1)(B) requires that all points relied on shall "state concisely the legal reasons for the appellant's claim of reversible error."  Errors raised in the argument portion of a brief but not raised in the points relied on need not be considered by this Court.  *State ex rel. Missouri Highway & Transp. Comm'n v. Dale*, 309 S.W.3d 380, 384 n.6 (Mo. App. 2010).  Defendant's point relied on challenges the sufficiency of the evidence to support convictions for first-degree assault and armed criminal action but makes no mention of a *corpus delicti* challenge.  That error is only raised at the very end of the argument section.

[14] This Court is sympathetic to Defendant's mother's belief that her son would benefit more from mental health treatment than prison, but the Court is obligated to follow the law regarding the crime of attempt as written by the legislature.



# SUPREME COURT OF MISSOURI
# en banc

STATE OF MISSOURI,            )
           )
       **Respondent,**            )
           )
**v.**            )        **No. SC94977**
           )
**BLAEC JAMES LAMMERS,**            )
           )
       **Appellant.**            )

## DISSENTING OPINION

I respectfully dissent. The line between thought and the crime of attempt is crossed only after one takes a "substantial step" toward the commission of the offense. Mr. Lammers admitted to homicidal thoughts, but he never engaged in conduct that, beyond a reasonable doubt, strongly corroborated a firm plan to act on those thoughts. Mr. Lammers should be receiving treatment for his mental illness rather than serving time in prison for a crime he did not commit.

Section 564.011 required the State to prove beyond a reasonable doubt that Mr. Lammers performed a "substantial step" toward committing a first-degree assault. A "substantial step" requires some act that is "strongly corroborative of the firmness of the

actor's purpose to complete the commission of the offense." *Id*. The 1973 comment to

the proposed section 564.011 provides examples of actions constituting a substantial step:

> (a) lying in wait, searching for or following the contemplated victim of the offense.

> (b) enticing or seeking to entice the contemplated victim of the offense to go to the place contemplated for its commission.

> (c) reconnoitering the place contemplated for the commission of the offense.

> (d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the offense will be committed.

> (e) possession of materials to be employed in the commission of the offense, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances.

> (f) possession, collection or fabrication of materials to be employed in the commission of the offense, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances.

> (g) soliciting an agent, whether innocent or not, to engage in conduct constituting an element of the offense or an attempt to commit such offense or which would establish the agent's complicity in its commission or attempted commission.

The foregoing list is not exhaustive, but each example shares at least two common

characteristics. First, each example identifies conduct that would most likely be

undertaken only as a precursor to completing the commission of the intended criminal

offense. When an individual lies in wait for the intended victim, entices the victim to a

certain place, solicits assistance to commit the crime, or gathers items specifically

designed to commit the crime under circumstances that have no lawful purpose, that

individual has engaged in conduct demonstrating a firm purpose to complete the intended

2

offense.  The second common characteristic is that Mr. Lammers engaged in none of this conduct.  Mr. Lammers did not lie in wait or entice a victim to a certain location.  He did not reconnoiter, inspect, or unlawfully enter a location as part of a plan to bring his thoughts to fruition.  He did not unlawfully possess the guns with no lawful purpose.  Mr. Lammers did not collect or fabricate any other items in order to carry out a plan. Mr. Lammers did not solicit assistance to act on his thoughts.  The net result is that it is difficult to conclude that Mr. Lammers' conduct constitutes a substantial step toward completing the offense of first-degree assault.

Consistent with the statutory definition and explanatory comment, this Court's most recent precedent indicates that proof of a substantial step requires evidence that the defendant has engaged in conduct that is clearly and unequivocally aimed at completing the intended criminal offense.  In *State v. Ess*, 453 S.W.3d 196, 207-08 (Mo. banc 2015), this Court unanimously reversed a conviction for attempted first-degree child molestation because there was insufficient evidence that the defendant had taken a substantial step toward completion of the offense.[1]   The evidence at trial showed that the defendant entered the victim's room, laid behind him, and placed the victim's hand on the defendant's clothing over his genitalia.  *Id*. at 208.  The defendant told the victim to "hold it between his legs while I slept." *Id*.  Despite the fact the defendant had obviously taken some steps toward committing the crime of first-degree child molestation, this Court held that there was insufficient evidence of a substantial step because the "evidence

---

[1] Judge Wilson authored a separate opinion, joined by Judge Fischer, that dissented from other aspects of *Ess* but concurred with the principal opinion's holding that there was insufficient evidence to support a conviction for attempted first-degree child molestation.

was not strongly corroborative of [the defendant's] purpose to complete the offense of first-degree child molestation, which at the time required skin-to-skin contact by touching underneath the clothing." *Id.*

Similar to *Ess*, the facts of this case, troubling as they are, do not establish beyond a reasonable doubt that Mr. Lammers had a firm purpose to actually commit a first-degree assault. Mr. Lammers thought about committing an assault, lawfully purchased two guns and then practiced using the guns. Unlike Mr. Ess, Mr. Lammers never approached any person or location with intent to do harm. While Mr. Ess took every step necessary to be on the cusp of completing the offense, Mr. Lammers did not. If Mr. Ess' conduct did not constitute a substantial step, then Mr. Lammers' conduct certainly does not qualify.

The principal opinion asserts that *Ess* is unique and plainly distinguishable because after entering the victim's bedroom, lying next to him, and placing the victim's hand over his covered genitals, Mr. Ess left the room before completing the crime of first-degree child molestation by engaging in skin-to-skin contact. The principal opinion asserts that, unlike this case, it is clear that there was no evidence that Mr. Ess' conduct constituted a substantial step toward engaging in skin-to-skin contact. I respectfully disagree with this interpretation of *Ess*.

The fact that Mr. Ess did not complete the offense by actually touching his victim is no defense to an attempt charge precisely because the nature of an attempt is that the intended offense was not completed. As the principal opinion notes, the substantial step analysis does not focus on what the defendant did not do, it focuses on what the

4

defendant did and whether that conduct strongly corroborates the defendant's purpose to commit the intended offense. Although Mr. Ess undertook every single step necessary to complete the intended offense, except for the final step of engaging in skin-to-skin contact, there was insufficient evidence for a reasonable fact-finder to conclude that he took a substantial step toward actually engaging in skin-to-skin contact and thereby completing the offense of first-degree child molestation. If the evidence in *Ess* is insufficient for a reasonable fact-finder to conclude that Mr. Ess' conduct constituted a substantial step, it would seem that a reasonable fact-finder would experience even greater difficulty in finding a substantial step in this case.

The principal opinion concludes that Mr. Lammers crossed the line between thought and action because he lawfully purchased firearms and ammunition and then spent an afternoon shooting soda cans with a friend. After Mr. Lammers went target shooting, he relinquished the guns to his girlfriend's father. If the evidence in this case constitutes an attempt, then it is also an attempt to privately entertain the idea of hitting a random person, buying a bat, swinging the bat, and then discarding the bat. The crime of attempt requires more. When the terrifying thoughts entertained by Mr. Lammers are set aside, the case against him crumbles. What remains is an expansive net of criminal liability that is not contemplated by the language of section 564.011 or prior case law.

Mr. Lammers' thoughts are cause for grave concern, but his conduct was not criminal. I would reverse the judgment and vacate the conviction for attempted first-degree assault.

_____

Richard B. Teitelman, Judge