

# Missouri Court of Appeals
## Southern District
### Division One

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | No. SD35689 |
| | ) | |
| CODY RANDALL McKENZIE, | ) | FILED: February 25, 2020 |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden, Judge

**<u>AFFIRMED</u>**

Cody Randall McKenzie ("Defendant") appeals his convictions, following a jury trial, of the class A felony of first-degree assault and the unclassified felony of armed criminal action. *See* sections 565.050 and 571.015, respectively.[1] Defendant presents two points on appeal claiming the trial court (1) erred in denying his motion for judgment of acquittal because the evidence was insufficient to support his convictions and (2) erred "in finding [D]efendant's peremptory strikes of two male jurors were not gender neutral and were pretextual and discriminatory strikes."[2] Finding no merit in Defendant's claims, we affirm.

---

[1] All statutory references are to RSMo Cum.Supp. (2017). All rule references are to Missouri Court Rules (2019).

[2] Both of Defendant's points on appeal are multifarious because each contains "more than one basis for reversal." ***Kirk v. State***, 520 S.W.3d 443, 450 n.3 (Mo. banc 2017). In his first point, Defendant claims reversible error on the basis that "there was insufficient evidence to support an intentional assault and armed criminal action verdict by a reasonable jury[.]" In that same point, Defendant also asserts reversible error on the basis that "the evidence and inferences therefrom clearly show the defendant to have acted in a lawful defense-of-another and himself." In his

1

<u>**Point 1—Convictions Supported by Sufficient Evidence**</u>

***Standard of Review***

Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt. This Court considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. Contrary evidence and inferences are disregarded. The Court will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences.

***State v. Lammers***, 479 S.W.3d 624, 632 (Mo. banc 2016) (internal citations omitted).

***Factual and Procedural Background***

Scotty Blevins ("Victim") and his fiancée, Anna Eubanks ("Eubanks") lived together on Hanover Drive. Before January 10, 2017, Victim did not know Defendant or Defendant's mother Nicola McElroy ("McElroy").

On that date, while driving toward home a little before 11 p.m., Eubanks called Victim and told him that somebody was following her, but she did not know who the person was. Victim initially told her to drive to the police station, but Eubanks responded that she was not near the police station and was near their house. Victim then told her to come to the house and shortly thereafter she pulled into the driveway. Victim walked out to meet Eubanks in the driveway and took two guns that he legally purchased and possessed with him: a .22 rifle, and a

---

second point, Defendant first asserts as a basis for reversal the trial court's error "in finding defendant's peremptory strikes of two male jurors were not gender neutral and were pretextual and discriminatory strikes." In the same point, he also asserts a second and different basis for reversal in that the trial court "further clearly erred" when it ordered Defendant to strike two female jurors. Multifarious points relied on violate Rule 84.04(d) and preserve nothing for review. *See id.*; ***State v. S.F.***, 483 S.W.3d 385, 388 n.5 (Mo. banc 2016); ***Missouri Bankers Ass'n, Inc. v. St. Louis Cty.***, 448 S.W.3d 267, 271 (Mo. banc 2014). While this deficiency justifies denial of the point, we may, nevertheless, gratuitously exercise our discretion to review the defective point and resolve issues on their merits. ***Bowers v. Bowers***, 543 S.W.3d 608, 615 (Mo. banc 2018). Here, we exercise that discretion to *ex gratia* address the merits of the first basis for reversal alleged in each point, but deny that portion of each point related to the second alleged basis for reversal. *See* ***Spence v. BNSF Ry. Co.***, 547 S.W.3d 769, 779 n.12 (Mo. banc 2018) (electing to review only the first of multiple claims in a multifarious point relied on). Moreover, as the State correctly points out, the second alleged basis for reversal in Defendant's second point was also not preserved for appellate review because Defendant failed to make a timely, specific objection to the order at trial and failed to assert the alleged error in his motion for a new trial.

loaded AK-47 style rifle. Victim took the guns because he thought "maybe if they saw that I had a gun, then they would drive -- drive on, leave us alone."

When Eubanks exited her vehicle,[3] Victim handed her the .22 rifle and stepped out of the way, but remained on his driveway, with the AK-47 rifle he was holding and pointing toward the ground. At about that same time, the vehicle following Eubanks came to a stop somewhere behind Eubanks' vehicle, and McElroy and Defendant exited it.[4] While Victim was watching McElroy walk rapidly onto his driveway and physically engage Eubanks, causing Eubanks to drop the .22 rifle to the ground, "all of a sudden" Defendant was in Victim's face and grabbed hold with both of his hands the AK-47 rifle that was then cradled in Victim's arms and which Victim had never pointed toward McElroy or Defendant. This began a four-minute "tug of war" between Defendant and Victim over possession of Victim's rifle. While the evidence is unclear as to when, at some point during this struggle, the rifle discharged leaving a bullet hole in the hood of another car parked in Victim's driveway.

Victim, who didn't know Defendant, was afraid that if Defendant got the rifle away from him, Defendant would shoot him and his fiancée. During this extended struggle, Defendant repeatedly struck Victim with one of his fists, while still maintaining his grip on the rifle with his other hand. In this manner, Defendant repeatedly landed multiple volleys of punches to Victim's head and middle body in his attempts to gain possession of Victim's rifle. Victim, on the other hand, continually attempted to maintain his two-handed grip on the rifle in his efforts to maintain possession of his rifle. The only notable exception occurred when Victim's pants slipped down

---

[3] At this point, a surveillance camera on the front of Victim's house connected to a video security system started capturing and recording significant parts of the incident, and that video recording was admitted into evidence and played for the jury.

[4] This vehicle belonged to and was driven at the time by Amber Maggard, who is McElroy's sister and Defendant's aunt. The whereabouts of Maggard or her vehicle after this stop on the night in question is not disclosed by the record.

3

below his torso and he used one hand to try and pull them back up. Defendant used that opportunity, however, to land a volley of blows to Victim's head with his right fist thereby frustrating Victim's attempts to pull up his pants in favor of returning to his two-handed grip on his rifle. About three and a half minutes into the "tug of war" for possession of Victim's rifle, Defendant "picked [Victim] up and body slammed [him] to the ground," causing Victim's head to hit the concrete driveway and Defendant to end up in a sitting position on top of Victim thereby pinning him to the driveway. From that position, Defendant struck Victim's head with his left fist seven times and then switched to striking Victim's midsection with his right fist seven times. Following those volleys, Defendant repositioned his seated position on Victim, continuing to pin him down on the driveway, and struck Victim's head with his left fist nine times causing the back of Victim's head to hit the concrete driveway with each strike. After the ninth blow to his head, Victim released his grip on his rifle.

Upon gaining possession of Victim's rifle, Defendant stood up and took three steps away from where Victim remained prone on the driveway. Defendant then turned around, stepped back toward Victim while simultaneously changing the placement of his two-handed grip on the rifle, and struck Victim in the upper chest with the butt of the rifle. Defendant then again turned away from Victim and walked about 10-12 feet over to where McElroy had Eubanks "pinned down on the ground" and "had the upper hand." About five seconds later, Defendant turned back around, walked over to Victim, who was still on his back in the same place on the driveway, kicked Victim in the head with his left foot, and, raised the rifle up, swung it down, and struck Victim's head with the butt of the rifle. Defendant then turned away from Victim, but after taking two steps, turned back around, returned to Victim, and again struck Victim in the head with the butt of the rifle. Defendant then walked back over to the McElroy-Eubanks

4

struggle and engaged with them for about 15 seconds before he returned to Victim, still prone in the same location on the driveway, and kicked Victim in the head with his left foot.

Defendant testified at trial. He admitted striking Victim in the face and chest with his fists and the butt of the rifle. He also admitted that he continued to strike Victim once he was on the ground after he had obtained sole possession and control of the rifle from Victim. Defendant also conceded that after getting control of Victim's rifle and ensuring that his mother "had the upper hand" in her struggle with Eubanks, Defendant went back to hit Victim again and kicked him in the head.

Defendant also testified that after the incident, neither he nor his mother called 911, but rather, they left the scene by walking up the street with both rifles, "pitched" the rifles into someone's yard, and successfully hid from police officers in a "safe spot" after they heard sirens approaching.

Victim was hospitalized with several injuries, including difficulty breathing out of one side of his nose due to a deviated septum, "a broken nose, a broken cheekbone, two broken ribs, and both of the orbital sockets of [his] eyes were shattered." The last injury required surgical repair with titanium plates placed all the way around Victim's eyes. Defendant testified that he caused these injuries when he struck Victim with his fists and the rifle. Victim suffers from ongoing medical issues as a result of the incident, including the deviated septum, double vision, a constant headache, impaired balance, and memory loss.

### *Discussion*

Defendant was convicted of assault in the first degree. *See* section 565.050. A person commits first degree assault "if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Section 565.050.1. Assault in the first degree is a class A felony if it results in serious physical injury to the victim. Section 565.050.2. "Serious

5

physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." Section 556.061.44. A "protracted loss or impairment" is defined as "'a decrease or diminishing or damaging of an action or ability of the body to do that for which it is intended that is something short of permanent but more than of short duration.'" *State v. Hall*, 561 S.W.3d 449, 454 (Mo.App. 2018) (quoting *State v. Roper*, 136 S.W.3d 891, 897 (Mo.App. 2004)).

Defendant was also convicted of the unclassified felony of armed criminal action. *See* section 571.015. "[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action." Section 571.015.1.

Analytically, a claim of insufficient evidence involves three sequential steps:

1. Identify a challenged factual proposition needed to sustain the conviction;

2. Identify all favorable evidence in the record tending to prove that proposition; and

3. Show why such evidence, when considered along with its reasonable inferences, is so non-probative that no reasonable fact-finder could believe the proposition.

*State v. Finch*, 398 S.W.3d 928, 929 (Mo.App. 2013).

Here, Defendant fails to identify any challenged factual proposition needed to sustain either of his convictions. In his point and argument, he makes no reference to any of the elements of either of the charged offenses. Such first-step failure necessarily dooms Defendant's claim because it is only within the context of the specific elements of an offense that steps two and three have any analytical meaning or value. *See Lammers*, 479 S.W.3d at 632 (review of

sufficiency of evidence limited to whether State has introduced adequate evidence from which a reasonable finder of fact could have found each *element* of the crime beyond a reasonable doubt).

Rather than challenging the evidentiary support for any element of the charged offenses, and by such omission thereby essentially conceding the sufficiency of the evidence as to all of those elements, Defendant asserts that "[t]he theory of the defendant's case was clearly his acting in defense of himself and his mother, both of which were in a struggle with people in possession of firearms with the obvious intent to use them." In his argument under this point, as he did at trial, Defendant relies entirely upon the credibility of his and McElroy's testimony about alleged circumstances that led Defendant to enter upon Victim's property and the non-credibility of Eubanks' statement to Victim that she did not know who was following her giving rise to an inference supporting Defendant and McElroy's testimony. Defendant's theory of the case and supporting testimony were submitted to the jury through Instruction No. 5 (self-defense) and Instruction No. 6 (defense-of-another), and both defenses were rejected by the jury. "The jury… may believe or disbelieve all, part, or none of the testimony of any witness." *State v. Williams*, 313 S.W.3d 656, 660 (Mo. banc 2010) (internal quotation marks and citations omitted). In rejecting both defenses, the jury disbelieved Defendant and McElroy's version of events and either believed that Eubanks' statement to Victim was truthful or that it failed to give rise to any inference that supported Defendant and McElroy's version of events.

In the context of a sufficiency of the evidence challenge, Defendant and McElroy's testimony and the inference that Eubanks was untruthful in her statement to Victim, as recited and relied upon in Defendant's argument under this point, are all contrary to the jury's verdict. In our sufficiency review, "[c]ontrary evidence and inferences are disregarded." *Lammers*, 479 S.W.3d 624 at 632. Such disregarded evidence and inferences, therefore, provide no basis for a

determination that the evidence was insufficient to support Defendant's convictions. Defendant's first point is denied.[5]

### Point 2—No Clear Error in Trial Court's Denial of Defendant's Peremptory Strikes

In his second point on appeal, Defendant claims, "The trial court clearly erred in finding defendant's peremptory strikes of two male jurors were not gender neutral and were pretextual and discriminatory strikes because said findings were not based on any specific facts given by the state[.]" We disagree.

#### *Factual and Procedural Background*

The following background is relevant to this point. During *voir dire*, after strikes for cause were heard and completed, a short recess was taken. Upon return, the court stated, that Juror Nos. 2, 6, 7, 9, 12, 16, 18, 19, 23, 26, 27, 28, and 34 were selected for the jury from the panel. After this announcement on the record, another short recess was taken. Upon returning on the record, the State argued,

> Your Honor, the notes that I have show the defense peremptory strikes were Juror No. 5, Juror No. 8, Juror No. 14, Juror No. 20, Juror No. 24, and Juror No. 31. They are all six men. I believe, under the line of Batson[6] cases, that gender also applies as something that just can't – you cannot exclude jurors just for that reason . . . I do think that violates Batson, and I would ask that at least some of those strikes be changed.

The trial court responded that ***Batson*** and the line of subsequent cases apply the doctrine to gender and asked defense counsel to provide a gender-neutral reason for each of the strikes.

Defense counsel stated that Juror No. 5 "is an engineer. He works for a corporation, Jack Henry. He's single with no kids. We did not feel like he would be as sympathetic as other jurors to the defense, to our self-defense claim." Defense counsel stated that Juror No. 14, "had been

---

[5] We have *ex gratia* determined that the State introduced adequate evidence from which a reasonable finder of fact could have found each element of the charged crimes beyond a reasonable doubt. *See **Lammers***, 479 S.W.3d at 632.
[6] ***Batson v. Kentucky***, 476 U.S. 79 (1986).

previously on a jury. He was all about guns. So I don't know if he said that, but he confirmed that with the things he said, and relative to the other people on the panel, we did not think he would be an appropriate person to keep on the panel. If I'd have left him on the panel, [Defendant] could have PCR'd me for ineffective assistance."

The State responded,

Looking at Juror No. 5 in particular, defense says they strike him because he's an engineer, had -- he was single and had no kids, so he didn't think he would be sympathetic. Juror Nos. 16 and 12 are both women. They are single; they don't have kids. [Defense counsel] says Juror No. 14, that -- that he had served on a jury before. I think the Court remembers there were a lot of people, including women, that had served on juries before, and that his family had guns. . . But I think specifically with 5 and 14, there are problems there that seem to suggest that this is more about gender when all six people being struck are men.

The court then asked defense counsel to respond, to which defense counsel stated: "but if we go back to No. 5, I – I don't think there was another juror on the panel who worked for a corporation, Jack Henry, who was an engineer who was also single and had no kids." In response, the State asked,

What does him being an engineer have to do with whether or not he would be an appropriate juror to strike? I mean, you could -- whenever we raise them, having provided a gender neutral reason, you could literally go through every juror and just read their employment and say what they do because they all do different things. I think, looking at all of it together, the fact that all six of them are men -- while he can try to finger point at different little reasons why he's striking them, I think that looks pretty questionable, and I would ask that some of that be changed.

The record indicates that defense counsel did not respond to this question.

The court then stated,

[Defense counsel], if all of them were not male, the fact that 5 and 14 had been -- you know, four out of the six that were stricken and two of them were females would have been different. But when you -- when they are all males, and then – I'm going to find that I don't think that there was a gender neutral basis for striking 5 and 14.

9

### *Standard of Review*

We review the trial court's findings on a ***Batson*** challenge for clear error. ***State v. McFadden***, 216 S.W.3d 673, 675 (Mo. banc 2007) ("The trial court's findings on a ***Batson*** challenge will be set aside if they are clearly erroneous. . . ."). The trial court's findings of fact on a ***Batson*** challenge will only be set aside if "the reviewing court is left with the definite and firm conviction that a mistake has been made." ***State v. Bateman***, 318 S.W.3d 681, 687 (Mo. banc 2010). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." ***McFadden***, 369 S.W.3d 727, 738 (Mo. banc 2012) (citing ***State v. Deck***, 303 S.W.3d 527, 535 (Mo. banc 2010)).

### *Discussion*

"Under the Equal Protection Clause, a party may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." ***State v. Marlowe***, 89 S.W.3d 464, 468 (Mo. banc 2002) (citing ***United States v. Martinez–Salazar***, 528 U.S. 304, 315 (2000), citing ***Batson v. Kentucky***, 476 U.S. 79 (1986) (race)). "The ***Batson*** doctrine has been… extended to challenges the State makes in response to a defendant's allegedly purposeful discrimination on the grounds of race, gender, or ethnic origin in the exercise of peremptory strikes."[7] ***State v. Letica***, 356 S.W.3d 157, 164 (Mo. banc 2011).

The Supreme Court of Missouri has established a three-step procedure to resolve a ***Batson*** challenge. ***Marlowe***, 89 S.W.3d at 468 (citing ***State v. Parker***, 836 S.W.2d 930, 939

---

[7] ***Batson*** challenges made by the State are sometimes referred to as reverse–***Batson*** challenges. *See* ***Letica***, 356 S.W.3d at 164; ***State v. Chambers***, 234 S.W.3d 501, 507 (Mo.App. 2007). Because Defendant here has not pointed us to any distinction in the applicable law based upon the identity of the party raising the challenge, we refer to the objection made by the State in the trial court to Defendant's preemptory strikes as a ***Batson*** challenge. Similarly, we cite to applicable case law in this opinion without drawing any particular or explicit distinction as to the identity of the party raising the challenge.

(Mo. banc 1992)).  First, the opponent must object to the proponent's peremptory strike and identify the protected class to which the venireperson or persons belong.  *Id.*  Second, the burden shifts to the proponent of the strike to provide a reasonably specific and clearly identified protected class-neutral explanation for the strike.  *Id.*  Third, if the proponent proffers an acceptable non-discriminatory reason, the burden is on the opponent to prove "that the proffered reason was merely pretextual and that the strike was, in fact, motivated by [a discriminatory reason]."  *State v. Evans*, 490 S.W.3d 377, 384 (Mo.App. 2016) (citing *State v. Durham,* 299 S.W.3d 316, 323 (Mo.App. 2009)).  "In determining pretext, the main consideration is the plausibility of the [proponent's] explanations in light of the totality of the facts and circumstances surrounding the case.  The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike."  *Letica*, 356 S.W.3d at 164 (internal quotation marks and citations omitted).

Here, Defendant challenges the trial court's finding concerning the third step of the *Batson* challenge.  "It is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  *Id.* at 165 (internal quotation marks omitted).  In this third step, the trial court must make a credibility determination whether the proponent's second-step proffered reason for the strike was a valid reason or a mere pretext for discrimination.  *Id.*  "This determination by the trial court is made considering the totality of all relevant factors, and appellate review of the determination recognizes that the trial court is free to believe or disbelieve an alleged [protected class]-neutral explanation as mere pretext for discrimination."  *Id.* at 165 n.6.

11

Four factors are considered to determine whether a proffered reason for striking a potential juror is pretextual. *State v. Chambers*, 234 S.W.3d 501, 515 (Mo.App. 2007). First, we consider whether there are similarly situated venirepersons who were not struck. *Id.* During the first consideration, we focus on the "plausibility of the contemporaneous explanation" offered by counsel during trial and ignore justifications made after the fact. *Id.* Second, we consider "the degree of logical relevance between the proffered explanation and the case to be tried." *Id.* The third factor we consider is the attorney's credibility based on his or her demeanor, statements during *voir dire*, or the trial court's previous experiences with the attorney. *Id.*; *State v. Strong*, 142 S.W.3d 702, 712 (Mo. 2004). The fourth and final factor is the demeanor of venirepersons who were struck. *Chambers*, 234 S.W.3d at 515. We examine the record to determine whether it includes any references to the demeanor of the excluded jurors or the excluding attorney, such as references to inappropriate conduct. *Id.* at 516.

In this case, Defendant has not demonstrated that the trial court made a mistake in its determination that his proffered reasons for striking Juror Nos. 5 and 14 were pretextual. The record shows the State identified similarly situated venirepersons that the Defendant did not strike. Defendant's "contemporaneous explanation" proffered for striking Juror No. 5 was that he was an engineer, "works for a corporation," and was single with no children. The State responded by identifying Juror Nos. 16 and 12 as similarly situated women who were both single and had no children. Defendant's purported gender-neutral explanation for striking Juror No. 14 was that he was "all about guns" and because he previously served on a jury. The State responded by identifying Juror No. 18 as a similarly situated woman who stated, "We were a family of hunters, so growing up we were all about guns and safety. And we -- we had assault rifles and we did play with them, but it's all about the gun owner, too." Concerning Juror No.

12

14, the State argued that there were several venirepersons, some women, who had acknowledged prior service on juries. Thus, the trial court could have found the existence of similarly situated jurors to those struck by the defendant.

Next, we examine the degree of logical relevance between counsel's proffered explanation and the case to be tried. We consider "the kind of crime charged, the nature of the evidence to be adduced, and the potential punishment if the defendant is convicted. . . ." *See Parker*, 836 S.W.2d 930, 940 (Mo. banc 1992). Defense counsel noted that Juror No. 5 was struck because he worked for a corporation and was an engineer; however, defense counsel failed to explain any connection between the venireperson's employment and the case to be tried. Defendant now argues that his explanation for striking the juror was that he was not "best to objectively and with some sympathy evaluate the defense's case based on a child's act of physical force in defense of his mother." This post-hoc explanation was not offered when prompted by the trial court and does not explain why the venireperson's employment would make him more or less sympathetic to the defense's self-defense or defense-of-another arguments. The trial court could have found no logical connection between the venireperson's employment and the case to be tried.

The other explanations offered by Defendant were the marital status and familial status of the jurors. Defendant is correct that the Supreme Court of Missouri has held that marital status is a "race-neutral, gender-neutral factor[] that the [proponent] may properly consider when making peremptory strikes." **State v. Barnett**, 980 S.W.2d 297, 302 (Mo. 1998). Here, whether or not the juror has children is a potentially important factor to the Defendant's defense-of-another arguments because Defendant claimed to act in defense of his mother. In addition, the explanation that defense counsel struck Juror No. 14 because he was "all about guns" was also

13

logically relevant to the case to be tried. Importantly, however, the only one of these explanations that did not also apply to another potential female juror was the proffered explanation about Juror No. 5's employment, which, as noted *supra*, is not logically relevant to the case to be tried. Therefore, the trial court could have found that even though the other explanations were logically relevant, the existence of similarly situated potential female jurors supports that the strikes were discriminatory. *See McFadden*, 191 S.W.3d at 651 (stating "Evidence of purposeful discrimination is established when the stated reason for striking a[ ] [male] venireperson applies to an otherwise-similar member of another [gender] who is permitted to serve.").

We consider the last two factors together because they both concern the demeanor of the defense counsel and the excluded venirepersons. *See Chambers*, 234 S.W.3d at 516. There is nothing in the record to suggest that defense counsel acted improperly during *voir dire* and the record does not contain any references to the attorney's conduct in prior appearances before the trial court. Additionally, the record does not include any references to suggest that either Juror No. 5 or Juror No. 14 refused to answer counsels' questions or in any manner acted inappropriately.

Given the above analysis of the first two factors, the inapplicability of the last two factors, the totality of the circumstances, and that the trial court is free to believe or disbelieve an alleged gender-neutral explanation as mere pretext for discrimination, we are not "left with the definite and firm conviction that a mistake has been made[,]" *Bateman*, 318 S.W.3d at 687, by the trial court in finding that Defendant's proffered reasons for striking Juror Nos. 5 and 14 were pretextual and that the strikes were, in fact, motivated by their gender. In the absence of such a

14

conviction, the trial court committed no clear error in denying Defendant's preemptory strikes of Juror Nos. 5 and 14. Defendant's second point is denied.

## Decision

The trial court's judgment is affirmed.


GARY W. LYNCH, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – DISSENTS IN SEPARATE OPINION

WILLLIAM W. FRANCIS, JR., J. – CONCURS



# Missouri Court of Appeals
## Southern District
### Division One

STATE OF MISSOURI,                    )
                                      )
            Respondent,               )
                                      )
    vs.                               )      No. SD35689
                                      )
CODY RANDALL McKENZIE,                )      Filed:  February 25, 2020
                                      )
            Appellant.                )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden, Judge

**DISSENTING OPINION**

I respectfully dissent with regard to Point II.  If the trial court had simply granted the prosecutor's **Batson**[1] challenge, it would have been a different matter; however, the trial court did not just sustain a challenge to two different jurors.  The trial court told the defendant that the defendant must choose two females to replace the challenged males:

> THE COURT:  Well, it is -- this has come up one other time since Batson where one side or the other struck all six females. I think it is -- Batson and the cases after it say that it applies to gender. So at that point, once it applies, then I think you have to give us a gender neutral reason why you would strike each one of the jurors.
>
> . . . .

---

[1] **Batson v. Kentucky**, 476 U.S. 79 (1986).

1

THE COURT:  [Defense Counsel], if all of them were not male, the fact that 5 and 14 had been -- you know, four out of the six that were stricken and two of them were females would have been different. But when you -- when they are all males, and then – I'm going to find that I don't think that there was a gender neutral basis for striking 5 and 14.

So now the issue becomes -- I guess you need to pick two others out of the panel that are -- that aren't on the panel, and then we'll go from there.

[Defense Counsel]:  We'll go and come back.

THE COURT:  Yes. Go, I guess, and find the two females you want to replace them with.

[Defense Counsel]:  I don't know.

THE COURT:  Okay. So go talk about it and we'll wait.

As noted in the majority opinion, normally, it is the prosecutor who makes the strikes producing a non-diverse jury panel and the defendant who makes the ***Batson*** challenge.  It is no small irony that it was the prosecutor who succeeded in raising this challenge.  I do not believe it is currently the law that the trial court can demand the parties provide a certain number of jurors based on race, gender or ethnic origin.  I believe the trial court erred in requiring the defendant to find any two female jurors to replace the male jurors.  The court was prejudging any potential male as being unqualified to serve on the jury and disqualified solely on the basis of being a male.  Likewise, any female juror was acceptable to be on the panel.  It may very well be that a more diverse jury in all cases would produce better results; however, if that is the case, then defendants should also be able to demand a statistically representative jury.

Nancy Steffen Rahmeyer, J. – Dissenting Opinion Author

2