

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86061 |
| | ) | |
| CRAIG NEIL SALCEDO, | ) | Opinion filed: March 12, 2024 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF
CALLAWAY COUNTY, MISSOURI
THE HONORABLE JEFF HARRIS, JUDGE**

Division Four: Gary D. Witt, Chief Judge,
Edward R. Ardini, Jr., Judge and W. Page Bellamy, Special Judge

Craig Salcedo appeals the judgment of the Circuit Court of Callaway County convicting him, following a bench trial, of one count of the class D felony of possession of a controlled substance (methamphetamine) in violation of section 579.015, RSMo.[1] Salcedo raises two points on appeal. In his first point, he argues the trial court erred in denying his motion to dismiss, asserting that he was immune from prosecution under section 195.205 RSMo Supp. 2017 because the methamphetamine was discovered by law

---

[1] All statutory references are to RSMo 2016 unless otherwise noted.

enforcement while Salcedo was the subject of a good-faith request for medical assistance due to a medical emergency. In his second point, Salcedo argues the trial court erred in denying his motion to suppress the methamphetamine, "in that the deputy searched [him] without a warrant and without any other legal justification." For the reasons stated below, we affirm.

## Factual and Procedural Background

On May 10, 2021, Salcedo's mother ("Mother") filed an "Application to Court for 96 Hour Detention, Evaluation and Treatment/Rehabilitation" against Salcedo, requesting he be taken into custody and transferred to a hospital "for psychological evaluation" and "prescription stabilization."[2] In support of her application, Mother stated that Salcedo resided with her and she "fear[ed] assault, considering his history." She stated that "[l]ast summer, late Jun[e] 2020, he had angry episodes with other drivers [and] the police took him to MU Hospital for psychological evaluation on a 72 [hour] hold" and he was "diagnosed [with] some 'vague psychosis'"; "[a]bout 2 weeks ago, [she] found him with a long butcher knife, from [her] kitchen, stuck down a side pocket of his jeans" and he told Mother he "wouldn't 'randomly' hurt anyone, but 'if someone came at him, he would use

---

[2] "An application for detention for evaluation and treatment may be executed by any adult person, who . . . must allege under oath that the applicant has reason to believe that the respondent is suffering from a mental disorder and presents a likelihood of serious harm to himself or to others." § 632.305.1. The filing of the application "shall authorize the applicant to bring the matter before the court on an ex parte basis to determine whether the respondent should be taken into custody and transported to a mental health facility." § 632.305.2. "If the court finds that there is probable cause . . . to believe that the respondent may be suffering from a mental disorder and presents a likelihood of serious harm to himself or others, it shall direct a peace officer to take the respondent into custody and transport him to a mental health facility for detention for evaluation and treatment for a period not to exceed ninety-six hours . . . ." *Id.*

2

it to hurt them back'"; one week ago "he got violently angry when [she] took away his keys to [her] only car" and he "stood before [her], angrily clinching [sic] his fists" while screaming at her; and, three days ago, Salcedo wanted Mother "to buy him a bus ticket to Oklahoma, so that he could kill someone," and when Mother refused he screamed in the garage "for 20 minutes straight."

Mother further stated that Salcedo had been prescribed medications but "he [didn't] take them." She related that during the past year he had "talk[ed] to deceased people that he knows, or strange demons," and he "rambles when he's talking to people in his head." Two days prior to the filing of her application, Salcedo again started talking to people in his head and became angry that Mother didn't trust him with her car. Mother called the police, and, upon their arrival, Salcedo "calmed down [and] was respectful." Mother stated the police advised her that "[a]s long as he isn't suicidal or talks to police about killing someone, the police can not remove him from [her] house," and the police suggested Mother "complete papers to have him committed for psych evaluation."

The same day that Mother filed her application, the court issued an "Order for 96 Hour Detention, Evaluation and Treatment and Warrant," finding there was "probable cause to believe that [Salcedo] has a mental disorder and presents a likelihood of serious harm to [himself] or others." The warrant directed law enforcement to take Salcedo "into custody and transport" him to the University of Missouri Psychiatric Center "for detention, evaluation and treatment."

Later that day, deputies from the Callaway County Sheriff's Department were dispatched to "serve a 96-hour commit" on Salcedo and transport him to the hospital. The

3

deputies had been provided Mother's application and the court's order and warrant. When the deputies arrived at Salcedo and Mother's residence, Salcedo was argumentative and "aggravated that [the deputies] were there." Salcedo "did not want to comply with the order," and "stated that he believed the order was not legal." Salcedo was "alert," and "was walking around of his own accord." He "was able to calm down," and the deputies handcuffed him and led him to their patrol car.

One of the deputies searched Salcedo and found "a butane lighter" and a "little black box" in his pocket. There was "an opening at the top" of the box, and a bag "was just kind of sticking out of" it. The deputy "could see what was inside the box just by looking at it." Inside the bag was "a crystal-like substance" that the deputy suspected was methamphetamine. The deputy asked Salcedo, "What's this?" and Salcedo responded that it was "his salt." The substance was sent to the "crime lab," and testing revealed that the substance was methamphetamine and weighed 1.7 grams.

The State charged Salcedo with the class D felony of possession of a controlled substance in violation of section 579.015. Salcedo filed a motion to dismiss alleging that he "was the subject of a good faith request for medical assistance due to a medical emergency"; as a result of the request for medical assistance, Salcedo was searched "and alleged contraband was found"; and that section 195.205.2(1) bars prosecution "for violations of § 579.015 for anyone who is the 'subject of a good faith request' for 'medical assistance' to address a 'medical emergency,' 'if the evidence . . . was gained as a result of seeking or obtaining medical assistance.'" Salcedo also filed a motion to suppress, arguing

4

the deputies did not have a search warrant and no exception to the search warrant requirement applied.

After receiving evidence and hearing argument, the trial court denied both motions. Relating to the motion to dismiss, the trial court found that the immunity provided in section 195.205 was not intended to reach "beyond drug overdoses and the opioid crisis," and that section 195.205 did not provide immunity for charges stemming from "a request for a non-drug related 96 hour mental health commitment." Concerning the motion to suppress, the trial court found "there was probable cause for the search and seizure."

The case proceeded to a bench trial, after which the trial court found Salcedo guilty. The trial court sentenced Salcedo to serve five years in the Missouri Department of Corrections, suspended the execution of the sentence, and placed him on a five-year term of probation. Salcedo appeals, challenging the trial court's denials of his motion to dismiss and motion to suppress.

## Point I – Motion to Dismiss

In his first point, Salcedo argues the trial court erred in denying his motion to dismiss, claiming that he was immune from prosecution under section 195.205.[3] He asserts section 195.205 "provides immunity from prosecution for possession of a controlled substance when it is found subject to a good-faith request for medical assistance for a

---

[3] "Generally, review of the trial court's ruling on a motion to dismiss is for an abuse of discretion." *State v. Rodgers*, 396 S.W.3d 398, 400 (Mo. App. W.D. 2013). However, where "the facts are uncontested and the only issue is a matter of statutory construction," the trial court's ruling on a motion to dismiss is subject to *de novo* review. *Id.* "The interpretation of a statute is a pure question of law, and therefore we give the circuit court's interpretation no deference." *Id.*

5

medical emergency," and that Mother, "in applying for a 96-hour detention, was seeking to obtain medical assistance for [Salcedo], who was experiencing a mental health medical emergency under 195.205.1(2)." We find, however, that Salcedo was not entitled to immunity under section 195.205 because he was not the subject of a request for "medical assistance for . . . a drug or alcohol overdose or other medical emergency" as required by the statute.

The issue raised in this point involves questions of statutory interpretation. "The primary rule of statutory interpretation is to give effect to the legislative intent as reflected in the plain language of the statute." *State v. Vaughn*, 648 S.W.3d 117, 119 (Mo. App. E.D. 2021) (quoting *State v. Knox*, 604 S.W.3d 316, 320 (Mo. banc 2020)). "We must also consider the context of a statute and not read any portion of it in isolation." *Id.* "In addition, the rule of lenity requires us to construe ambiguous criminal statutes strictly against the State." *Id.* "This rule, however, does not require a reviewing court to dispense with common sense or to ignore an evident statutory purpose." *Id.* at 120.

Section 195.205 was enacted as a new statutory provision in 2017, *Vaughn*, 648 S.W.3d at 120-22, during a time period in which many states were enacting "medical amnesty laws," or laws that offer "protection from punishment for individuals who seek emergency medical assistance during an overdose event," Scott Koven, Note, *Deserving Life: How Judicial Application of Medical Amnesty Laws Perpetuates Substance Use Stigma*, 80 Wash. & Lee L. Rev. 1745, 1762, 1763-64 (2023) (Forty-eight states and the District of Columbia "have passed some type of protective law," with the goal of "reduc[ing] the number of overdose deaths by incentivizing those using substances to call

6

911."); *see also* Nicole Schill, Note, *The Fatal Shortcomings of Our Good Samaritan Overdose Statutes and Proposed Model Statute*, 25 Cardozo J. Equal Rts. & Soc. Just. 123, 126 (2018) (Most medical amnesty laws are new, becoming effective within the last ten years "as a direct response to the growing opioid epidemic."). The Eastern District of this Court has described the enactment of section 195.205 as "an effort to combat the effects of the ongoing opioid epidemic," and noted that "[t]he legislature passed § 195.205 with the purpose of saving the lives of overdose victims by encouraging people to seek medical assistance without fear of criminal prosecution." *State v. Gill*, 642 S.W.3d 356, 359-60, 363 (Mo. App. E.D. 2022).

Section 195.205 provides that "[a] person who, in good faith, seeks or obtains medical assistance for someone who is experiencing a drug or alcohol overdose or other medical emergency . . . or is the subject of a good faith request shall not be arrested, charged, prosecuted, convicted . . . or otherwise be penalized" for, among other enumerated offenses, violations of section 579.015, if the evidence for the arrest, charge, prosecution, conviction or penalty "was gained as a result of seeking or obtaining medical assistance[.]" § 195.205.2. The term "medical assistance" is defined to include, but is not limited to, "reporting a drug or alcohol overdose or other medical emergency to law enforcement, the 911 system, a poison control center, or a medical provider; assisting someone so reporting; or providing care to someone who is experiencing a drug or alcohol overdose or other medical emergency while awaiting the arrival of medical assistance." § 195.205.1(2).

The immunity conferred by section 195.205 is not triggered anytime health care is sought for an individual suffering from a malady. The statute is considerably less sweeping

in its breadth. The statute's plain language limits the immunity to those situations where an individual "is experiencing a drug or alcohol overdose or other medical emergency." Indeed, the triggering request for "medical assistance" is similarly limited to "reporting a drug or alcohol overdose or other medical emergency[.]" Thus, as there is no dispute that Salcedo was not suffering from an alcohol or drug overdose, in order to prevail, Salcedo had the burden to establish that Mother's application for a 96-hour involuntary commitment was commensurate with "reporting a . . . medical emergency[.]" *See Gill*, 642 S.W.3d at 361 (In a prosecution under section 579.015, the defendant bears the burden of both raising and proving that he was entitled to the benefit of any applicable provision contained in chapter 195, including section 195.205.). We find he did not.

The General Assembly's use of the phrase "medical emergency" plainly evinces an intent to limit the reach of the statutory immunity to good faith requests for medical aid in support of individuals experiencing distress of a type necessitating immediate medical attention. Indeed, the purpose of the statute is to incentivize people to promptly seek necessary medical attention for victims of overdose or individuals suffering from an emergent medical issue by limiting the prospect of a criminal prosecution arising from contraband found by responding personnel. *See Gill*, 642 S.W.3d at 359-60 ("The Missouri General Assembly enacted § 195.205 in 2017 to encourage witnesses of drug overdoses to *promptly* seek potentially life-saving medical attention." (emphasis added)).

In this instance, Mother did not seek immediate medical attention for Salcedo. Instead, she initiated an *ex parte* legal action through the probate division of the circuit court. *See* § 632.305.2. Mother's filing of an application for the involuntary commitment

8

of her son was undoubtedly a difficult decision but it was qualitatively distinguishable from reporting a medical emergency to law enforcement, 911, or a healthcare provider, and lacked the indicia of exigency or capability of immediate response associated with the nature of requests contemplated under section 195.205.

We additionally observe that Mother's application to have Salcedo involuntarily committed reveals that her efforts were not pursued for the purpose of obtaining prompt medical care for a "medical emergency"; instead, the record reflects that the filing of the application was motivated by Mother's fear of Salcedo and concern for the safety of herself and others. Mother began her affidavit in support of her application by stating, "I fear assault." She then went on say that she "felt [Salcedo] might hurt [her]" and he had "[a]ngry violent episodes where he clinch[ed] [sic] hands repeatedly like [he was] ready to hit [her]." Mother described an incident when Salcedo broke her bedroom door so she could no longer lock it, adding she "now [was] very afraid of his anger." Mother also stated that Salcedo was "6'1", angry. [She was] 5'3", in a walker, and really afraid now."[4] Mother did not "want to help [Salcedo] go to [Oklahoma] to kill someone." Mother concluded her affidavit by stating, "I am fearful for my personal safety."

As Mother's application for involuntary commitment was not a request to address a "medical emergency," it follows that the deputies were not responding to a request for "medical assistance" when they arrived at Salcedo's residence. Rather, the deputies were executing a warrant pursuant to a court order "command[ing]" that law enforcement detain

---

[4] Mother stated she was "disabled from a vertebrae fracture in [her] back" and used a walker or wheelchair.

9

and transport Salcedo. Indeed, a deputy testified that their "part" was "just" to "serv[e] the warrant."

To that end, the deputies did not discover the evidence that formed the basis of Salcedo's possession charge "as a result" of a request for medical assistance. Section 195.205 only provides immunity if the evidence for the charge "was gained as a result of seeking or obtaining medical assistance." § 195.205.2. As further discussed in the following point, the deputies searched Salcedo for safety purposes because they were taking him into custody and transporting him in a patrol vehicle, and it was only because of that search they discovered the methamphetamine in Salcedo's pocket. Thus, the evidence here was gained "as a result" of the deputies executing a warrant, not responding to a request for medical assistance.

Because Salcedo was not the subject of a request for "medical assistance," and the evidence forming the basis for his charge was not "gained as a result of seeking or obtaining medical assistance," he was not entitled to the immunity afforded by section 195.205. For these reasons, we find the trial court did not err or abuse its discretion in denying his motion to dismiss. Point I is denied.

## Point II – Motion to Suppress

In his second point, Salcedo challenges the trial court's denial of his motion to suppress "the controlled substance evidence that was found on [his] person."

"A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous."[5] *State v. Lammers*, 479 S.W.3d 624, 630 (Mo. banc 2016). "The trial court's ruling will be deemed clearly erroneous if, after review of the entire record, this Court is left with the definite and firm impression that a mistake has been made." *Id.* "This Court defers to the trial court's factual findings and credibility determinations and considers all evidence and reasonable inferences in the light most favorable to the trial court's ruling." *Id.* "Whether conduct violates the Fourth Amendment is an issue of law that this Court reviews *de novo*." *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007).

Salcedo contends that his right to be free from unreasonable search and seizure was violated when the deputies searched him without a warrant or legal justification. We disagree, and find the deputies' search of Salcedo, incident to Salcedo being taken into custody pursuant to a warrant under section 632.305 for transport to a mental health facility, was reasonable.

"The Fourth Amendment protects the right of citizens to be free from unreasonable searches and seizures[.]" *State v. Lovelady*, 432 S.W.3d 187, 190 (Mo. banc 2014). "The Fourth Amendment applies not only to governmental searches and seizures in criminal investigations, but also in various civil proceedings." *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 544 (1st Cir. 1996) (emphasis omitted); *see also Soldal v. Cook*

---

[5] The State argues that Salcedo is only entitled to plain error review of this claim because he did not object at trial to this evidence at the earliest opportunity, and thus the claim is not preserved. However, for the reasons described below, even presuming the issue was preserved and reviewing for clear error, Salcedo's claim does not succeed. Thus, we do not resolve the preservation dispute raised by the State.

*County, Ill.*, 506 U.S. 56, 69 (1992) ("As we have observed on more than one occasion, it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." (internal marks omitted)).

Warrantless searches are unreasonable, subject to certain exceptions. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). One such exception is a search incident to lawful arrest, which permits "the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape" and to "seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Riley v. California*, 573 U.S. 373, 383 (2014) (quoting *Chimel v. California*, 395 U.S. 752, 762-63 (1969)). "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338. The justifications of officer safety and discovery of evidence do not depend on the "probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Riley*, 573 U.S. at 384 (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)).

Here, Salcedo was not arrested for committing a crime; rather, he was taken into custody pursuant to a valid civil detention warrant, which was issued upon a judge's finding of probable cause that Salcedo had "a mental disorder and present[ed] a likelihood of serious harm to [himself] or others." We find it equally reasonable for officers to search an individual under these circumstances as it is to search a criminal suspect incident to arrest. In both situations, officers have lawfully taken an individual into their custody, and have a

12

legitimate interest in determining whether the detainee has a weapon or other item that could be used to harm himself or the officers. The safety interests underlying the search-incident-to-arrest exception are equally implicated—if not more so—where there has been a probable cause finding of mental illness and likelihood of serious harm. *See State v. Collins*, 53 P.3d 953, 957 (Utah Ct. App. 2002) (finding a search incident to civil commitment custody for mental health reasons was reasonable without a search warrant: "Indeed, a protective custody search of a mentally ill individual may be more warranted [than a search incident to arrest] given the greater likelihood that they could injure themselves or others with a concealed weapon.").

Consistent with these safety concerns, here, one of the deputies testified at the pre-trial hearing that they searched Salcedo to make sure there was "nothing on him that could be used as a weapon or used to hurt anybody, himself included." They checked his pockets and waistband, because those were places where he could "conceal a weapon or something else, something that could be used as a weapon." The deputy stated that a safety search was "standard" for everyone they take into custody pursuant to a warrant under section 632.305 for transport to a mental health facility. This testimony illustrates the true concern for safety underlying the deputies' search of Salcedo.

Although the reasonableness of a search incident to custodial detention under section 632.305 appears to be an issue of first impression in Missouri, the Missouri Supreme Court's decision in *State v. Friend*, 711 S.W.2d 508 (Mo. banc 1986), supports our conclusion that the search of Salcedo was reasonable. The holding of *Friend* suggests that, when considering the reasonableness of a search performed in a civil context, Missouri

13

courts will uphold the search if it is supported by the same legitimate interests that justify such searches in an analogous criminal context.

In *Friend*, the sheriff received a call that the defendant was drunk and creating a scene. 711 S.W.2d at 509. Because of the defendant's condition, "the sheriff decided to hold him in jail for twelve hours for detoxification and safekeeping, as authorized under section 67.315, RSMo Cum. Supp. 1984," a civil statute. *Id.* When the defendant arrived at jail, he was searched, which "was standard procedure before allowing any detainee to use the bathroom or enter a jail cell." *Id.* at 510. The defendant had drugs in his pocket; he was arrested and charged with the crime of drug possession. *Id.* The defendant moved to suppress the evidence, but the motion was overruled and he was convicted. *Id.* The defendant appealed, arguing the evidence was seized in violation of his right to be free from unreasonable search and seizure. *Id.*

In determining the reasonableness of the search, the Missouri Supreme Court first cited the well-established principle that an "inventory search of an arrested individual and his effects does not violate the Fourth Amendment," listing several "governmental interests that support the inventory process," which included "the need to safeguard the facility" and "protection of the police from danger." *Id.* But, as the Court noted, the defendant was not "under arrest at the time his possessions were being inventoried at the jail"; rather, he had been brought to jail for "detoxification and safekeeping." *Id.* Therefore, the issue presented in the case was "whether the police may apply the same inventory procedures when a person is being civilly detained as when one is arrested and detained." *Id.* The Court answered this question in the affirmative, finding that "[t]he policy considerations which

14

justify routine jail house searches are equally applicable when a person is brought into the jail for detoxification," that "[i]nventory searches have been upheld not because of their relationship to an arrest, but because of their relationship to legitimate custodial purposes," and that "[t]hese legitimate custodial purposes are equally present no matter what the characterization of the person being placed in jail." *Id.* at 510-11. The Court thus concluded that the inventory search was reasonable. *Id.* at 511.

In sum, *Friend* held that, because inventory searches of a civilly detained person serve the same governmental interests as inventory searches of criminal detainees, an inventory search of a civil detainee is reasonable. Similarly, here, we find that searches of an individual civilly detained under section 632.305 for mental health treatment serve the same interests as searches incident to arrest, and thus a search of the civil detainee is reasonable.

For these reasons, we find Salcedo's right to be free from unreasonable search and seizure was not violated. The trial court did not err in denying his motion to suppress. Point II is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.